ALGREN, Appellee and Cross–Appellant,

v.

ALGREN, Appellee; Algren, Appellant and Cross–Appellee.

[Cite as *Algren v. Algren,* 183 Ohio App.3d 114, 2009-Ohio-3009.]

Court of Appeals of Ohio,
Second District, Clark County.

Nos. 08–CA–43 and 08–CA–44.

Decided June 19, 2009.

116

Martin, McCarthy, Wright & Roach Co., L.P.A., and B. Randall Roach, for appellee and cross-appellant, Thomas Wayne Algren.

Valerie Juergens Wilt, for appellee, Debora Elizabeth Algren.

Timothy G. Crowley, and Louis M. Borowicz, for appellant and cross-appellee, Mark T. Algren.

———————

BROGAN, Judge.

{¶ 1} In a consolidated appeal, Mark T. Algren and Debora E. Algren appeal from a domestic relations court's judgment declaring that Mark owns no interest in Dayton Capscrew Company and granting Debora summary judgment. Mark contends that the evidence shows that the court erred in its conclusion that he owns no such interest. Debora contends only that the court erred in its finding that a stock-sale agreement is binding and enforceable.

{¶ 2} The question of law that we must resolve is whether a transfer of certificates is necessary to make a gift of corporate shares of stock. We conclude that the law does not require this transfer. The judgment of the trial court will be affirmed in part and reversed in part, and this cause will be remanded.

## I

{¶ 3} In 2005, Debora asked a domestic relations court for a divorce from her husband, Thomas W. Algren. Mark, their adult son, told them that he would claim part ownership of potential marital property—the interest that Thomas owns in Dayton Capscrew Company. Mark claimed that over several years, Thomas gave him shares of Dayton Capscrew as gifts.[1]

{¶ 4} Dayton Capscrew is a family business. In the beginning, Thomas and Debora jointly owned Dayton Capscrew as a partnership. Thomas ran the day-to-day operations, and Debora fulfilled the role of bookkeeper. In 1990, Dayton Capscrew was incorporated as an Ohio corporation. The articles of incorporation authorized the company to issue 750 shares of common stock. It issued 400 such shares to Thomas,[2] and he became the corporation's sole officer and shareholder.

{¶ 5} Mark started working in the family business in 1989 as an outside sales representative. In 1998, however, Mark established Industrial Fastener Supply, L.L.C. Mark left Dayton Capscrew and began operating Industrial Fastener in

———————

1. Because the three parties share a last name, for clarity we will refer to them by their first names.

2. The remaining 350 shares have never been issued.

early 2000. Mark's company sells products similar to those sold by Dayton Capscrew, so he became a competitor to his father's company. Mark said that he made the move because he believed that Thomas was not going to give him control of Dayton Capscrew as he had promised.

{¶ 6} The interest that Thomas owns in the company is, at least in part, marital property, which is subject to division between Thomas and Debora. For this reason, in September 2006, Debora filed a complaint against Mark seeking a declaratory judgment on what interest, if any, Mark has in Dayton Capscrew. In his answer, Mark claimed to own 108 shares. In April 2007, Debora filed a motion for summary judgment, claiming that Mark has no ownership interest in Dayton Capscrew. Two months later, Mark filed his own motion for summary judgment that asked the court to find him the lawful owner of 136 shares of Dayton Capscrew. Mark further asked the court to find that the terms and provisions of a stock-sale agreement, signed by him, Thomas, and Dayton Capscrew, are valid and enforceable.

{¶ 7} On September 14, 2007, the domestic relations court entered judgment on the declaratory judgment complaint. The court found that the existence and delivery of stock certificates are, as a matter of law, essential elements of Mark's claim. Because he could not produce this evidence, his ownership claim failed. Accordingly, the court sustained Debora's motion for summary judgment and overruled Mark's. The court also expressly resolved the complaint by declaring that Mark has no ownership interest in Dayton Capscrew. Mark appealed.

{¶ 8} We dismissed his appeal for lack of a final appealable order. While the trial court's judgment resolved the issue of Mark's ownership, it did not resolve the claims in the underlying divorce action, nor did the order contain an express determination, required by Civ.R. 54(B), that there was "no just reason for delay." In May 2008, the trial court entered an order amending the previous order to state that there is no just reason for delaying an appeal. Mark appealed again, and this time, Debora appealed too.

## II

{¶ 9} Mark assigns three errors for our review. The first assignment of error alleges:

{¶ 10} "The trial court erred in granting Debora Algren's motion for summary judgment."

{¶ 11} The second assignment of error alleges:

{¶ 12} "The trial court erred in declaring and concluding that appellant Mark T. Algren has no ownership interest in Dayton Capscrew Co."

{¶ 13} And the third assignment of error alleges:

{¶ 14} "The trial court erred when it denied appellant Mark T. Algren's motion for summary judgment."

{¶ 15} Because the same issue underlies each alleged error, we will consider the errors together.

{¶ 16} The central dispute is over the ownership of 136 shares of Dayton Capscrew's stock. When recent ownership of personal property has been established, ownership is presumed to continue until divestiture is proved. *Keifer v. Schuneman* (1948), 82 Ohio App. 285, 286, 38 O.O. 5, 78 N.E.2d 780. No one disputes that immediately after incorporation, Thomas owned all 400 issued shares. No evidence suggests that Thomas transferred any of those shares to anyone other than Mark, and none of the 350 unissued shares were ever issued. Thus, if Mark owns any shares, he must have acquired them directly from Thomas. Mark contends that Thomas gave the shares to him as gifts. Debora contends that the gifts were uncompleted. She appears to concede that the evidence shows Thomas had donative intent, but she argues that he never carried out his intentions and delivered stock certificates to Mark. While the ultimate question is Mark's ownership interest, the strength of his claim to ownership depends in large part on his ability to prove that Thomas completed the gifts that he intended to make.

{¶ 17} The trial court concluded that Mark owns no interest in Dayton Capscrew because Thomas made no gift to Mark of his shares. Thomas made no gift because he never delivered stock certificates, and a transfer of certificates is necessary as a matter of law to make a gift of corporate stock. The question that we must first address, then, is whether a transfer of certificates is necessary to make a gift of corporate stock. We review questions of law de novo.

{¶ 18} A "gift" in the eyes of the law—one that effects a transfer of title—requires two things. (Technically, acceptance of the gift is also required, but acceptance of a thing of value is generally presumed.) "First, there must be an intention on the part of the giver to part with his property[,] * * * but there must be something more than an intention. The intention to give to be made effective must be carried out by the donor, relinquishing dominion over the property and delivering it to the donee." *McKelvey's Admr. v. McKelvey* (1911), 14 Ohio C.C.(N.S.) 331, 23 Ohio C.D. 117; see also *Bolles v. Toledo Trust Co.* (1936), 132 Ohio St. 21, 7 O.O. 60, 4 N.E.2d 917, at paragraph one of the syllabus.

{¶ 19} The delivery requirement is fundamentally about relinquishing ownership and control. See *Horlocker v. Saunders* (1938), 59 Ohio App. 548, 550, 13 O.O. 299, 18 N.E.2d 994. Delivery is important because it manifests a transfer of legal title. Perhaps the best evidence (the most specific and definite) of

delivery is actual physical delivery of the thing given (e.g., handing over a book, given as a gift). While such evidence alone is not dispositive, it strongly suggests that a gift was made. Of course, not all things that one might wish to give are amenable to this sort of manual delivery.

{¶ 20} For things whose nature precludes actual physical delivery, the requirement can be satisfied in constructive or symbolic form. 52 Ohio Jurisprudence 3d (1999), Gifts, Section 18. Constructive delivery means delivery imputed by law, in other words, delivery in the eyes of the law, though not necessarily in fact. See Black's Law Dictionary (8th Ed.Rev.2004). Symbolic delivery refers to delivery of some thing that symbolizes the property. See id. So, for example, one can make a gift of land by giving a deed that names the recipient as grantee. But one can also make the same gift without manual delivery of a deed. One who instead records a deed that names the recipient as grantee also satisfies the delivery requirement. The record takes the place of a manual delivery. See *Showalter v. Miller* (1941), 70 Ohio App. 232, 25 O.O. 22, 45 N.E.2d 774; see also 52 Ohio Jurisprudence 3d (1999), Gifts, Section 18. Each situation features a different means of relinquishing ownership and control over the land, satisfying the delivery requirement. The key to delivery, and thus a completed gift, is for the one making the gift to do something that shows he gave up ownership and control in favor of the recipient.

{¶ 21} A share of corporate stock is personal property that, like land, one cannot deliver in an actual and physical way. Unlike land, though, corporate shares are intangible. A share of stock "merely represents or is a fractional part of some other property." *Millar v. Mountcastle* (1954), 161 Ohio St. 409, 416, 53 O.O. 333, 119 N.E.2d 626; R.C. 1701.24(A). The owner of a share of stock cannot hold it in her hand; rather, to own stock is to be entitled to "a bundle of rights flowing from the corporation." *Mut. Holding Co. v. Limbach* (1994), 71 Ohio St.3d 59, 60, 641 N.E.2d 1080. Today—more often in the past—corporate shares are sometimes represented by paper certificates. It is important, however, not to confuse the intangible share—what is actually owned—with the tangible piece of paper, which merely represents the thing owned.

{¶ 22} Because a certificate only represents a share, one does not need a certificate in hand to prove ownership. As the Ohio Supreme Court recognized early on, "It is a well-settled principle, so far as Ohio jurisprudence is concerned, that the shares of stock are property, but that the certificates are only the evidence of the ownership of those shares, and that they amount to no more than the title deeds of real estate. The certificates are a great convenience, and of great value as evidence, but they are certainly no more than evidence." *Cassidy v. Ellerhorst* (1924), 110 Ohio St. 535, 545, 144 N.E. 252. Possession of

certificates generally creates only a presumption that the holder is the owner of the represented shares.[3] *Bitonte v. Tiffin Sav. Bank* (1989), 65 Ohio App.3d 734, 737, 585 N.E.2d 460, citing 12 Ohio Jurisprudence 3d (1979), Business Relationships, Section 490, now 12 Ohio Jurisprudence 3d (1999), Business Relationships, Section 554. "[T]he accepted rule," in Ohio then, "is that share certificates * * * are not essential to ownership." *KDI Corp. v. Former Shareholders of Labtron of Am.* (C.A.6, 1976), 536 F.2d 1146, 1148. Accord 11 Ohio Jurisprudence 3d (1999), Business Relationships, Section 147.

{¶ 23} Thus it appears that the trial court misunderstood the law that it applied to the evidence. The existence and transfer of certificates may be the clearest evidence—the best evidence—of a completed gift of corporate stock, but such evidence is not required as a matter of law. Rather, what is required for a completed gift is clear and convincing evidence that the one who intended to make a gift of corporate stock in fact relinquished ownership and control. Still, our duty is not principally to determine whether the trial court's rationale was correct but whether its judgment was correct. So we will apply the correct law to see whether the trial court's judgment must be affirmed despite its misreading of the law. We will begin with its summary judgment decisions.

{¶ 24} "Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. 'Before ruling on a motion for summary judgment, the trial court's obligation is to read the evidence most favorably for the nonmoving party to see if there is a "genuine issue of material fact" to be resolved. Only if there is none does the court then decide whether the movant deserves judgment as a matter of law.' " *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, at ¶ 12.

{¶ 25} Neither Debora nor Mark proved that he is entitled to summary judgment, because there is a genuine issue of fact regarding the number of shares that Thomas gave to Mark as gifts. Upon reviewing the evidence, we think that reasonable minds can find that the number of shares was more than zero but less than 136.

{¶ 26} First, Thomas filed federal gift-tax returns indicating that he made gifts of shares to Mark. One return, for calendar year 1994, tells the Internal Revenue

---

3. Some stock certificates are held in "bearer" form, which means that physical possession of the certificate does bestow rights. R.C. 1308.01(A)(2). But most certificates are in "registered" form. This means that the paper certificate is simply evidence of title, and the list of actual owners is maintained elsewhere. R.C. 1308.01(A)(13).

Service ("IRS") that on June 1, 1994, Thomas, with Debora consenting, made a gift to Mark of 40 shares of Dayton Capscrew stock. This return was prepared and signed by John E. Cashdollar, C.P.A., and is dated March 31, 1995. A second return, also for calendar year 1994, tells the IRS that on June 1, 1994, Thomas, with Debora's consent, made a gift to Mark of 30 shares. The return was also prepared by Cashdollar, but remains unsigned and undated. A third return, for calendar year 1997, states that on December 29, 1997, Thomas, again with Debora consenting, made another gift to Mark of 28 shares of stock. This return too was prepared and signed by Cashdollar and is dated March 30, 1998. The return also states that gift tax returns had been filed for tax years 1994, 1995, and 1996. Further, there is a letter to Thomas from the IRS regarding this return—evidence that the return was actually filed. With these returns, Thomas essentially told the IRS, under penalty of perjury, that he in fact made gifts of corporate stock to Mark. See *MacLean v. J.S. MacLean Co.* (P.C.1955), 70 Ohio Law Abs. 102, 123 N.E.2d 761 ("Counsel for the plaintiff claims that the parties are bound by their own admissions in filing a gift tax return. It is our opinion that they did file a gift tax return and are bound by their own admissions that the transfer of the stock to them was a gift and we so hold").

{¶ 27} Second, there are several corporate documents that support Mark's ownership claim. In May 1994, Thomas, Mark, and Dayton Capscrew (represented by Thomas) signed a Corporate Restricted Stock Sale Agreement. Debora signed the agreement too as a witness. The agreement begins with several recitals, the first of which reads, "Thomas W. Algren and Mark T. Algren are the sole shareholders of the corporation, owning respectively 360 and 40 shares." Also, according to the minutes of Dayton Capscrew's fifth annual meeting of the board of directors, held in January 1994, the board agreed that "a transfer of forth [sic] shares, (40 shares) will be transfered [sic] to Mark T. Algren, and each year there after, as determined by the Board of Directors." And at the following year's meeting of the board of directors, the board agreed that "a transfer of thirty six shares, (36 shares) will be transferred, to Mark T. Algren, and each year thereafter, as determined by the Board of Directors." January 6, 1995 Minutes of the Sixth Annual Meeting of the Board of Directors. Moreover, Dayton Capscrew's corporate income tax returns indicate that Thomas relinquished ownership and control over part of his interest. The returns in the record show a decrease in the percentage of corporate stock owned by Thomas: from 1991 to 1993 Thomas owned 100 percent of the stock (400 shares); in 1995 his ownership decreased to 81 percent (324 shares); and from 1997–2004 Thomas owned 66 percent of the stock (264 shares). In 2005 his ownership inexplicably increased back to 100 percent.

{¶ 28} Finally, in 1996, Thomas's attorney sent him a letter that reads, "Enclosed please find the new stock certificates for you and your son for 292 and 108 shares, respectively. It is my understanding that you will update the share ledger in your minute book." There is a copy of a Dayton Capscrew stock certificate in the record that presumably accompanied the letter. The certificate is in Thomas's name and is signed by him in his individual capacity and in his capacity as an officer of Dayton Capscrew. It contains the following:

{¶ 29} Certificate Number: 6   For 292 shares

{¶ 30} Number Original Certificate: 4   Number Original Shares: 324

{¶ 31} Number of Shares Transferred: 32

{¶ 32} Received Certificate No. 4   For 324.

{¶ 33} This certificate, in particular, provides considerable support to Mark's claim of ownership.

{¶ 34} Based on this evidence, we think that reasonable minds can find that Thomas made a gift of at least some of the shares that Mark claims to own. Accordingly, because the evidence does not compel one to conclude either that Mark owns no shares or that he owns 136 shares, summary judgment is inappropriate. Thus, the trial court erred by sustaining Debora's motion for summary judgment. The first assignment of error is sustained, and the third assignment of error is overruled.[4]

{¶ 35} The second assignment of error is also sustained. The trial court's incorrect view of the law caused it to regard a single fact as dispositive. For this reason, the court did not weigh and consider carefully all the evidence that Mark presented before declaring him void of interest. We will remand to give the court the opportunity to do so.

{¶ 36} Mark also raises two discovery-related issues. The first concerns the trial court's failure to rule on Mark's motion to compel the production of documents from Thomas and its failure to rule on Debora's motion for a protective order. The second concerns whether the trial court must consider the requests for admission that Mark served and Thomas failed to answer as facts in the record. Because there is no record that the court made any formal decision with respect to either issue, and because on remand Mark will have the

---

4. Ordinarily a party cannot appeal an order denying a motion for summary judgment. But where nothing remains to be litigated in the declaratory judgment action, that is, the trial court has set forth the rights and responsibilities of the parties in its summary judgment decision, we treat the trial court's ruling as a final disposition of the declaratory judgment action. See *Hoop v. Nationwide Mut. Fire Ins. Co.*, Montgomery App. No. 19686, 2003-Ohio-3772, 2003 WL 21658596, at ¶ 2, fn. 1. Here, by concluding that Mark has no ownership interest in Dayton Capscrew, the trial court decided the declaratory judgment action.

opportunity to raise the issues before the trial court, we need not address them here.

## III

{¶ 37} Debora presents a single assignment of error:

{¶ 38} "The corporate restricted stock sales agreement is void for want and failure of consideration."

{¶ 39} The agreement's self-stated raison d'être is two-fold: "to provide (1) for the purchase by the corporation or the remaining parties of the stock of any party desiring to sell such stock; and (2) for the purchase by the corporation or the surviving parties of the stock of a deceased party." The trial court found, without elaboration, that the agreement is valid and binding on Thomas, Mark, and Dayton Capscrew.

{¶ 40} The resolution of this issue has only a negligible effect on the question of Mark's ownership interest. The agreement simply states that Mark owns shares, and this statement would have evidentiary force even if the agreement were not legally binding. Debora's concern, however, is that the agreement will frustrate the trial court's efforts to divide marital property in the divorce action. She worries that the agreement's control over the transfer of Dayton Capscrew's shares will prevent the court from giving her an interest in the company. Debora need not worry.

{¶ 41} The trial court, if it decides to award her an interest, will not be constrained by the agreement's provisions. "Absent a provision to the contrary, restrictions on the transfer of corporate shares of stock, whether contained in the articles of incorporation, bylaws, or in a separate agreement among the shareholders, are overwhelmingly held to apply only to voluntary transfers and not to transfers by operation of law." *Lehtinen v. Drs. Lehtinen, Mervart & West, Inc.*, 99 Ohio St.3d 69, 2003-Ohio-2574, 788 N.E.2d 1079, at ¶ 25. A judgment from the domestic relations court awarding Debora an interest would not result in a voluntary transfer.

{¶ 42} Even so, the agreement is supported by consideration. The recitals, and the nature of the agreement itself, show that Thomas and Mark each agreed to give up the right to sell his shares freely in exchange for a promise by Dayton Capscrew, and each other, to purchase his shares whenever he desires to sell them. Such a situation is desirable when one owns shares that few people would have an interest in purchasing. Also, by agreeing to limit who may purchase the company's shares, Thomas, Mark, and Dayton Capscrew receive the assurance that a stranger cannot become an owner. This is ample consideration

to support the trial court's finding of an enforceable contract. Debora's sole assignment of error is overruled.

## IV

{¶ 43} Mark's first two assignments of error are sustained, but his third assignment of error is overruled. Debora's sole assignment of error is also overruled. The judgment of the domestic relations court is affirmed in part and reversed in part, and this cause is remanded for further proceedings.

Judgment accordingly.

FAIN and FRENCH, JJ., concur.

JUDITH L. FRENCH, J., of the Tenth Appellate District, sitting by assignment.