[Cite as *Puritas Metal Prods., Inc. v. Cook*, 2012-Ohio-2116.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

PURITAS METAL PRODUCTS

    Appellee

    v.

RICHARD COOK, et al.

    Appellants

C.A. No.    10CA009866

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    07CV151740
                07CV152715

DECISION AND JOURNAL ENTRY

Dated: May 14, 2012

DICKINSON, Judge.

INTRODUCTION

{¶1}    This appeal presents a complicated question regarding whether a share-transfer restriction in a close corporation's code of regulations applies to shares that the company issued to a trust when the beneficiary of that trust dies. In the 1990s, Robert Cook and four others formed Puritas Metal Products Inc. According to the company's original code of regulations, before a shareholder could transfer his shares to a non-shareholder, he had to offer them for purchase to the corporation and the other shareholders. In 1998, the company cancelled the shares it had issued to Mr. Cook and reissued them to the Robert S. Cook Trust. Mr. Cook and his wife, Barbara, were co-trustees of the trust, and Mr. Cook was its sole beneficiary. Between 1998 and Mr. Cook's death in 2002, the trust acquired additional shares and became Puritas's majority shareholder.

{¶2} According to Mrs. Cook, upon Mr. Cook's death, the trust became a marital trust with her as the remaining trustee and sole beneficiary. She has argued that no transfer of the Puritas stock took place at the time of Mr. Cook's death because it remained in the same trust it had been in before his death. After Mr. Cook's death, Mrs. Cook administered the shares and voted at shareholder meetings. According to Christopher Cole, one of Puritas's other shareholders, the marital trust was actually one of several new trusts created upon Mr. Cook's death, and the shares, therefore, had to be offered to the company and its other shareholders before they could validly transfer to the new, marital trust.

{¶3} Mrs. Cook obtained a judgment in the Lorain County Probate Court adopting her interpretation of the trust document. She also, allegedly, had Mr. Cole arrested for trespassing on Puritas's property. Mr. Cole subsequently filed a complaint in the Lorain County Common Pleas Court requesting a declaratory judgment regarding the status of Mr. Cook's trust's shares and seeking damages against Mrs. Cook for fraud, malicious prosecution, intentional infliction of emotional distress, tortious interference with a business relationship, defamation, abuse of process, breach of fiduciary duty, and sheltering of assets. Following a hearing, the trial court declared that the marital trust was a separate trust and that Mr. Cook's trust's shares had to be offered to Puritas before they could validly transfer to it. The court also concluded that, because the marital trust did not validly own the shares, any votes Mrs. Cook had cast over the past few years were void. Mrs. Cook has appealed, assigning five errors. We conclude that we have jurisdiction over this appeal and that the trial court incorrectly determined that Mr. Cook's death resulted in a "transfer" under Puritas's code of regulations.

JURISDICTION

**{¶4}** Before reaching the merits of Mrs. Cook's appeal, we must determine whether we have jurisdiction. Mr. Cole has moved to dismiss the appeal, arguing that the trial court's decision is not a judgment or final order and that, even if it is, the claims that have been decided are so inextricably intertwined with those that have not that we do not have jurisdiction at this time.

**{¶5}** Under the Ohio Constitution, Ohio's courts of appeals "have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district . . . ." Ohio Constitution, Article IV, Section 3(B)(2). The Ohio Supreme Court has held that Article IV Section 3(B)(2) "empower[s] the General Assembly to alter the appellate jurisdiction of the Court of Appeals." *State v. Collins*, 24 Ohio St. 2d 107, 108 (1970). The Ohio General Assembly, in Section 2501.02 of the Ohio Revised Code, has provided that the courts of appeals "shall have jurisdiction . . . to review, affirm, modify, set aside, or reverse judgments or final orders of courts of record inferior to the court of appeals within the district . . . ." *See also* R.C. 2505.03(A) (providing that "[e]very final order, judgment, or decree of a [lower] court . . . may be reviewed on appeal[.]").

**{¶6}** Section 2505.02(B) defines "final order." Under that section, "[a]n order is a final order . . . when it is . . . (1) [a]n order that affects a substantial right in an action that in effect determines the action and prevents a judgment; (2) [a]n order that affects a substantial right made in a special proceeding or upon a summary application in an action after judgment; (3) [a]n order that vacates or sets aside a judgment or grants a new trial; (4) [a]n order that grants or denies a provisional remedy . . . (5) [a]n order that determines that an action may or may not be

maintained as a class action; (6) [a]n order determining the constitutionality of any changes to the Revised Code made by Am. Sub. S.B. 281 of the 124th general assembly . . . or any changes made by Sub. S.B. 80 of the 125th general assembly . . . [or] (7) [a]n order in an appropriation proceeding that may be appealed pursuant to [Section 163.09(B)(3) of the Ohio Revised Code]."

{¶7} Mrs. Cook has argued that the trial court's decision is a final order under Section 2505.02(B)(2) because it "affect[ed] a substantial right made in a special proceeding." She has argued that the court's decision was a ruling on a request for a declaratory judgment and that declaratory judgment actions are special proceedings. She has also argued that the order "affect[ed] a substantial right" because it deprived the marital trust of the right to own and control a majority interest in Puritas.

{¶8} As Mrs. Cook has correctly noted, the Ohio Supreme Court has held that a declaratory judgment action is a special proceeding. *Gen. Acc. Ins. Co. v. Ins. Co. of North Am.*, 44 Ohio St. 3d 17, paragraph two of the syllabus (1989). The question, therefore, is whether the trial court's decision affected a substantial right. Under Section 2505.02(A)(1), "'[s]ubstantial right' means a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect." An order "affects" a substantial right "only if an immediate appeal is necessary to protect the right effectively." *Wilhelm-Kissinger v. Kissinger*, 129 Ohio St. 3d 90, 2011-Ohio-2317, at ¶ 7.

{¶9} We conclude that the trial court's order affected a substantial right. The shares of a corporation are personal property, and property rights are expressly protected by the Ohio Constitution. R.C. 1701.24(A); *Norwood v. Horney*, 110 Ohio St. 3d 353, 2006-Ohio-3799, at ¶ 37. Because the trial court's decision prevents Mrs. Cook from voting the marital trust's shares, which represent a majority interest in a business that is a going concern, we conclude that an

immediate appeal is necessary to effectively protect the trust's rights. Accordingly, the trial court's decision is a final order under Section 2505.02(B)(2).

{¶10} Even if a decision is a final order, it is not appealable if it does not comply with the rules prescribed by the Ohio Supreme Court regarding the timing of appeals. Under Article IV Section 5(B) of the Ohio Constitution, the Ohio Supreme Court has authority to "prescribe rules governing practice and procedure in all courts of the state . . . ." Exercising that authority, the Supreme Court has adopted the Ohio Rules of Civil and Appellate Procedure, which contain requirements regarding the timing of appeals. *See Alexander v. Buckeye Pipe Line Co.*, 49 Ohio St. 2d 158, 159-60 (1977) ("Questions involving the joinder and separation of claims and the timing of appeals are matters of practice and procedure within the rule-making authority of this court . . . ."). For instance, under Rule 54(B) of the Ohio Rules of Civil Procedure, "[if] more than one claim for relief is presented in an action . . . or when multiple parties are involved, the court may enter final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay." The term "judgment" under Civil Rule 54(B) includes final orders under Section 2505.02. Civ. R. 54(A).

{¶11} Acknowledging the dual requirements of finality and appealability, the Ohio Supreme Court has explained that "[a]n order which adjudicates one or more but fewer than all the claims or the rights and liabilities of fewer than all the parties must meet the requirements of R.C. 2505.02 and Civ.R. 54(B) in order to be final and appealable." *Noble v. Colwell*, 44 Ohio St. 3d 92, syllabus (1989). In this case, the trial court has not adjudicated Mr. Cole's tort claims, but expressly determined that there is no just cause for delay. Accordingly, on its face, the decision satisfies the requirements of Civil Rule 54(B).

{¶12} Mr. Cole has argued that, even though the court found that there is no just cause for delay, we do not have jurisdiction over the appeal because the claims it has resolved are inextricably intertwined with the ones it has not. In *Chef Italiano Corporation v. Kent State University*, 44 Ohio St. 3d 86 (1989), the Ohio Supreme Court noted that, in some cases, the claims are "so inextricably intertwined as to make the eventual relief sought the same even though the claims are pled separately." *Id.* at 90, fn.5. It explained that, if the relief sought is the same, then, for purposes of Civil Rule 54(B), there is, essentially, only one claim. *Id.* In such cases, Civil Rule 54(B) is inapplicable and does not make an order that does not resolve all of the claims immediately appealable. *Id.*

{¶13} In addition to requesting a declaratory judgment regarding Mr. Cook's trust's shares, Mr. Cole sued Mrs. Cook for fraud for not telling the probate court about the controversy over the shares or the buyout provisions in Puritas's code of regulations, then using its judgment to remove him as president of the corporation. He sued her for malicious prosecution for having the police department arrest him for trespassing on Puritas's property. He also sued her for intentional infliction of emotional distress, alleging that she knows he has a condition that can be fatal if he is put under a lot of stress; for tortious interference with a business relationship, alleging that his removal from Puritas caused discussions he was having with the federal government regarding another business he is involved with to fall through; for defamation because of the way he was characterized in a company press release after his removal; for abuse of process for jeopardizing his work visa and potentially subjecting him to deportation; for breach of fiduciary duty because of her attempts to terminate him just because he questioned her ability to exercise Mr. Cook's trust's shares after his death; and for sheltering assets, alleging she

had used a company called Cook Family Investments Ltd. to protect her assets from creditors and asking that he be allowed to recover any damages to which he is entitled from it.

{¶14} The trial court determined that Mr. Cook's trust's shares had to be offered to the corporation before they could validly pass to Mrs. Cook's marital trust. It ordered Mrs. Cook to offer the shares to Puritas and Puritas's other shareholders to respond to the offer within the time period designated in the code of regulations. Although it did not decide any of Mr. Cole's tort claims, it noted that, if Puritas's board of directors named or elected him as an officer or employee of the corporation, he would have the unconditional right to enter the corporation's premises at any time.

{¶15} Under *Chef Italiano*, claims are inextricably intertwined if the "eventual relief sought [is] the same[.]" *Chef Italiano Corp. v. Kent State Univ.*, 44 Ohio St. 3d 86, 90 n.5 (1989). In this case, the trial court resolved Mr. Cole's request for declaratory relief but not his tort claims, which seek monetary relief. Not only is the relief Mr. Cole seeks by his tort claims of a different nature than what he seeks by his declaratory judgment claim, his tort claims are not dependent on a determination that Mr. Cook's trust and the marital trust are separate trusts or a determination that Mrs. Cook must offer the shares to Puritas for purchase. Accordingly, we conclude that this case does not involve inextricably intertwined claims that negate the application of Rule 54(B) of the Ohio Rules of Civil Procedure. Mr. Cole's motion to dismiss is denied.

THE SHARE-TRANSFER RESTRICTIONS

{¶16} Mr. Cook was one of five original shareholders when Puritas was incorporated in July 1997. The original code of regulations provided that no shareholder could transfer shares, "except as provided by this Agreement." It then provided that a shareholder could transfer

shares to another shareholder at any time. It also provided that a shareholder who received an offer to purchase shares from a bona fide purchaser (other than a shareholder) had to first offer the shares to the corporation on the same terms and, if the corporation did not buy them, had to offer them to all the other shareholders. If none of the other shareholders agreed to purchase them, the shareholder had 60 days within which to sell them to the bona fide purchaser on the previously agreed upon terms. The code further provided an alternative under which a shareholder could offer to sell shares, first to the corporation and then to the other shareholders, at a price set using a formula included in the code. Presumably this alternative was established for shareholders who might wish to transfer their shares but did not have a ready bona fide purchaser. Under it, if neither the corporation nor other shareholders agreed to purchase the shares, the shareholder was free to "transfer the offered shares upon such terms and conditions and to such transferees as determined in the sole discretion of the Seller."

{¶17} In January 1998, with the consent of the other shareholders, Mr. Cook transferred his shares to the Robert S. Cook Trust. In July of that same year, the shareholders modified the share-transfer restrictions by amending the code of regulations to take away the option of transferring shares to another shareholder without first offering them to the corporation and all the other shareholders. Under the modified restrictions, a shareholder wishing to sell shares to anyone was required to first offer them to the corporation at the value established under the formula included in the regulations. If the corporation did not purchase them, the shareholder could then offer them to the existing shareholders on a pro rata basis, in order to maintain the existing parity. If the shareholders did not agree to purchase on a pro rata basis, the shareholder could then offer them to any existing shareholder or shareholders in any proportion. Finally, if no shareholder agreed to purchase them, the shareholder could offer them to an outside party.

The one exception was that Mr. Cook and John D. Beckett, another of the original shareholders, were free to sell shares to each other without restriction. The share-transfer restrictions were again purportedly modified in May 2006, but that modification, if effective, is not relevant to the resolution of this case.

{¶18} In August 1998, Puritas cancelled Mr. Cook's original shares and issued replacement shares, most of which it issued to the Robert S. Cook Trust. It issued the remainder of Mr. Cook's shares to a new shareholder. Puritas cancelled the shares of the other four original shareholders on that same day and issued replacement shares for them as well. As with Mr. Cook, it issued most of the replacements for the shares of three of the other original shareholders to trusts they had created. Apparently there were tax advantages to holding the shares in trust.

{¶19} Ohio corporations are authorized to include share-transfer restrictions in their regulations by Section 1701.11(B)(8) of the Ohio Revised Code. Such restrictions are widely used, particularly in close corporations, so current shareholders can control the ownership and management of the corporation and prevent outsiders from "invading the business." 12 Jennifer L. Berger & Carol A. Jones, Fletcher Cyclopedia of the Law of Private Corporations, Section 5454 (Rev. Vol. 2004). *See also Maurer v. Haines City Mobile Park & Sales Inc.*, 6th Dist. No. WD-00-051, 2002-Ohio-1516, at *4. The Puritas restrictions, as modified in July 1998, had the additional purpose of maintaining parity among the shareholders, except for how that parity could be effected by transfers between the Robert S. Cook Trust and the John D. Beckett Trust. Restrictions like those adopted by the Puritas shareholders are a form of contract and, as such, are subject to the same rules of construction as ordinary contracts. *See Algren v. Algren*, 183 Ohio App. 3d 114, 2009-Ohio-3009, at ¶ 42; 12 Jennifer L. Berger & Carol A. Jones, Fletcher Cyclopedia of the Law of Private Corporations, Section 5455 (Rev. Vol. 2004).

THE NATURE OF A TRUST BENEFICIARY'S INTEREST IN TRUST PROPERTY

{¶20} Mrs. Cook's first assignment of error is that the trial court incorrectly concluded that Mr. Cook's trust's shares were improperly transferred to a separate marital trust in violation of Puritas's code of regulations. She has argued that the court incorrectly determined that the marital trust was a new, independent trust. According to her, the marital trust was the same trust and the designation of it as a marital trust was simply a recognition that she, as Mr. Cook's surviving spouse, was now the beneficiary. She has further argued that, even if the marital trust was a new, separate trust, the fact that the shares were now held in that trust did not constitute a transfer in ownership because, as one of the trustees of the original trust, she was a legal owner of the shares and, as the trustee of the marital trust, she remains the legal owner of the shares.

{¶21} Trust law is located between contract law and property law, occupying its own space but also overlapping its two neighbors. Thomas P. Gallanis, *The New Direction of American Trust Law*, 97 Iowa L. Rev. 215, 234 (2011). Scholars debate whether trust law is closer to contract law or property law. *Id*. at 234-235. Those who view trust law as closer to contract law see a trust as a contract between the settlor and the trustee, with the trust's beneficiaries being "akin to contractual third-party beneficiaries." *Id*. at 235. Those who view trust law as closer to property law, view a trust as "a property arrangement arising from a conveyance or devise, not a contract." *Id*. The difficult issue underlying this debate is whether a trust beneficiary has a proprietary interest in the subject matter of the trust or whether he or she has only a third-party beneficiary interest in the contract between the settlor and the trustee. *See* 3 Austin Wakeman Scott, William Franklin Fratcher, & Mark L. Ascher, Scott and Ascher on Trusts § 13.1, 808 (5th ed. 2007). As it relates to this case, if trust law is viewed as closer to contract law, Mrs. Cook did not acquire any additional property interest in the Puritas shares

upon Mr. Cook's death beyond what she already had. As co-trustee, she was a legal owner of the shares before Mr. Cook's death and remained a legal owner after his death. The equitable interest she received upon his death was simply a third-party beneficiary interest under the contract between Mr. Cook as settlor and herself as trustee. On the other hand, if trust law is viewed as closer to property law, upon Mr. Cook's death, the property interest he had in the shares as beneficiary of the trust passed to Mrs. Cook upon her becoming the beneficiary. To that extent, therefore, there would have been a "transfer" of ownership of the shares regardless of whether the marital trust was a new trust or simply a continuation of the existing trust. Although the Ohio Supreme Court has characterized a beneficiary's interest in a trust as an "equitable interest," it has not classified that equitable interest as closer to a contractual interest or a property interest. *See Pack v. Osborn*, 117 Ohio St. 3d 14, 2008-Ohio-90, ¶ 7. Fortunately, we do not have to resolve the contract v. property debate in order to decide this case. The real issue is whether the change in beneficiary, regardless of whether that change was a change of third-party beneficiary or a partial change in ownership, was a "transfer" within the meaning of Puritas's code of regulations. *See* Restatement of the Law 3d, Trusts, Part 4, Nature of Beneficiaries' Rights and Interests, Introductory Note (2003) ("Even where such characterization issues are relevant, their proper resolution depends on the purposes and policies underlying the particular inquiry and thus frequently on other bodies of law.").

## APPLICABILITY OF RESTRICTION

{¶22} As previously noted, because the share-transfer restrictions adopted by the Puritas shareholders are a form of contract, they are subject to the same rules of construction as ordinary contracts. See *Algren v. Algren*, 183 Ohio App. 3d 114, 2009-Ohio-3009, at ¶ 42; 12 Jennifer L. Berger & Carol A. Jones, Fletcher Cyclopedia of the Law of Private Corporations, Section 5455

(Rev. Vol. 2004). "The purpose of contract construction is to effectuate the intent of the parties," which "is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 132 (1987). Common, undefined words appearing in a written instrument "will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, paragraph two of the syllabus (1978).

{¶23} We agree with the majority view expressed by the Eleventh District Court of Appeals and the courts of many other states that, because share-transfer restrictions limit the alienation of property, they should be "looked upon with disfavor" and "strictly construed." *Osborne v. Farinacci*, 11th Dist. No. 6-215, 1978 WL 216020 at *1, 2 (Sept. 11, 1978). *See* 12 Berger & Jones, Fletcher Cyclopedia of the Law of Private Corporations, Section 5455 (collecting cases); *see also First Fed. Sav. & Loan Ass'n of Toledo v. Perry's Landing Inc.*, 11 Ohio App. 3d 135, 142 (6th Dist. 1983). One of the consequences of strictly construing share-transfer restrictions is that, for this Court to conclude that a particular type of transfer is prohibited, the restriction must be "expressly provided and not merely implied." *Osborne*, 1978 WL 216020 at *2. For example, unless a company's regulations contain an "express restriction on intestate or testamentary disposition, . . . none can be implied." *Vogel v. Melish*, 203 N.E.2d 411, 413 (Ill. 1965). We also note that the Ohio Supreme Court has recognized that, absent a provision to the contrary, share-transfer restrictions "apply only to voluntary transfers and not to transfers by operation of law." *Lehtinen v. Drs. Lehtinen, Mervart & West Inc.*, 99 Ohio St. 3d 69, 2003-Ohio-2574, at ¶ 25.

{¶24} Puritas's original code of regulations provided that "[n]o Shareholder may transfer shares to any person except as provided by this Agreement." It also provided that

"[s]hares obtained in any way not authorized by Sections 2.02 through 2.06 shall be offered for sale as hereinafter provided." Section 2.02 contained language regarding the transfer of shares, providing that a shareholder could transfer ownership of his shares to another shareholder at any time. Section 2.02 also provided the corporation and the other shareholders were entitled to a right of first refusal if a shareholder received an offer to purchase from a non-shareholder or wanted to sell his or her shares. Section 2.03 contained provisions regarding corporate transfers, Section 2.04 contained guidelines for apportioning shares if the corporation exercised its right of first refusal, Section 2.05 contained guidelines for determining the value of shares, and Section 2.06 provided that the corporation could maintain life insurance on each shareholder. Although Puritas's board amended the share-transfer restrictions in 1998, the amendments only pertained to the procedure that a shareholder would have to follow if he wanted to sell his shares, and are not relevant to this case.

{¶25} Upon review of the original code of regulations' share-transfer restrictions, we note that they contain only broad, general language limiting transfers of shares. There is no language defining what is meant by "transfer" or that specifically addresses shares that are owned by a trust. The ordinary meaning of the word "transfer" is "to carry or take from one person or place to another[,] . . . to move or send to a different location[,] . . . [or] to cause to pass from one person or thing to another . . . ." Webster's Third New Int'l Dict. 2427 (1993).

{¶26} According to Mr. Cook's trust instrument, the trust he created was to be known as the "Robert S. Cook Trust." The instrument contained sections regarding the "Trust During Donor's Life" and one regarding its "Disposition at Donor's Death." According to Paragraph 6, the disposition section, "A. If my wife, Barbara Cook, survives me, then there shall be paid and distributed to my lineal descendants who survive me, per stirpes, (i) all assets which are not

includable in my estate for federal estate tax purposes plus (ii) an amount of the remaining trust property which is equal to the credit shelter equivalent available to my estate for federal estate tax purposes; provided, however: (1) [a]ny property that would otherwise by distributable hereunder to a grandchild of mine who has not attained the age of thirty-five (35) years shall be retained by the Trustees and held and administered as a separate trust for the benefit of such grandchild . . . (2) [a]ny property that would otherwise by distributable hereunder to a person, other than a grandchild of mine, who has not attained the age of twenty-one (21) years shall be retained by the Trustees and held and administered as a separate trust for the benefit of such person . . . . B. If my wife survives me, all property not paid and distributed to my lineal descendants pursuant to subparagraph A above shall be held and administered as a Marital Trust in accordance with the provisions of Paragraph 7 below."

{¶27} Under the terms of the trust, at Mr. Cook's death, Puritas's shares were retained by the trustees of the trust to be "held" as a Marital Trust. Regardless of whether the Marital Trust is deemed a new trust or is merely a continuation of the Robert S. Cook Trust, we conclude that nothing can be considered to have "transfer[red]" under Puritas's code of regulations. Although the beneficiary of the trust corpus changed from Mr. Cook to Mrs. Cook, there is nothing in the code of regulations that suggests that such an event would trigger the corporation's right of first refusal.

{¶28} Two other considerations support our conclusion that there was no transfer under the code of regulations. In this case, Mr. Cook did not simply place shares that the company had issued to him in trust. Rather, in August 1998, the corporation explicitly cancelled the shares it had issued to Mr. Cook and reissued most of them to the "Robert S. Cook Trust." At the time that the corporation issued the shares to the trust, it could have ascertained what would happen to

the shares at the time of Mr. Cook's death. If Puritas had wanted to give its shareholders the right of first refusal upon the death of a trust beneficiary, it could have amended its code of regulations to include express language regarding shares held in trust. Similar to those cases involving the testamentary disposition of close corporation shares, we conclude that, because Puritas's code of regulations did not contain a specific provision regarding shares held by a trust, the share-transfer restriction applied only to voluntary inter vivos transfers and not any change in ownership that occurred because of the death of the trust's beneficiary. *See Osborne v. Farinacci*, 11th Dist. No. 6-215, 1978 WL 216020 at *2 (Sept. 11, 1978) ("[A]ny restriction on testamentary disposition should be expressly provided and not merely implied."). In other words, we conclude that, if a corporation issues shares to a trust, a "transfer" does not occur under the corporation's non-specific share-transfer restriction when the beneficiary of the trust dies.

{¶29} We also note that, after Mr. Cook died, the two other shareholders that held Puritas stock at the time did not object to Mrs. Cook's exercise of his trust's shares or demand that she offer the shares to the corporation under the share-transfer restrictions. A few months after Mr. Cook's death, the other shareholders, in fact, transferred some of their shares to the Robert S. Cook Trust and, later, allowed Mrs. Cook to buy over 500 additional shares on behalf of the trust. We, therefore, conclude that, even if the share-transfer restriction could be viewed as applying, Puritas forfeited its right to enforce it by acquiescing to Mrs. Cook's control over the trust's shares. *See* 12 Jennifer L. Berger & Carol A. Jones, Fletcher Cyclopedia of the Law of Private Corporations, Section 5460.80 (Rev. Vol. 2004) ("A share transfer restriction may be waived by the corporation, shareholders, or other persons. Waiver of a share transfer restriction may occur by failing to exercise a right of first refusal within a specified or reasonable time,

disregarding the restriction for a lengthy period of time, or consenting to transfers."); *Thompson v. Anderson*, 498 P.2d 1, 2 (Kan. 1972); *Am. Nat'l Bank v. Oriental Mills*, 23 A. 795, 799 (R.I. 1891) (explaining that, because the right of first refusal provision was "solely for the benefit of the then existing stockholders, . . . [those stockholders] clearly had power to waive it.").

{¶30} Upon review of Puritas's original code of regulations and the 1998 amendments, we conclude that Mr. Cook's death did not trigger the application of the share-transfer restrictions to the shares held by his trust. As the remaining trustee of the Robert S. Cook Trust and the sole trustee of the marital trust formed by that same instrument, Mrs. Cook had authority to exercise all powers related to the Robert S. Cook Trust shares. Mrs. Cook's first assignment of error is sustained.

REMAINING ASSIGNMENTS OF ERROR

{¶31} Mrs. Cook's second assignment of error is that the trial court incorrectly concluded that, as trustee of the marital trust, she is required to offer to sell the marital trust's shares to Puritas and its other shareholders. Her third assignment of error is that the trial court incorrectly concluded that Puritas's other shareholders did not waive their right to compel the marital trust to offer its shares for purchase. Her fourth assignment of error is that the trial court incorrectly declared that all of the shareholder votes that she has cast since December 31, 2004, are void. Her fifth assignment of error is that the trial court incorrectly enjoined her from exercising her shareholder voting rights and granted Mr. Cole the voting rights of a 95% shareholder.

{¶32} For the reasons stated in our disposition of Mrs. Cook's first assignment of error, we conclude that the trial court incorrectly determined that Mrs. Cook must offer the shares that she controls to the corporation and its other shareholders and that the votes she cast on behalf of

those shares are void. It also incorrectly concluded that Mr. Cole owns 95% of the shares that may be voted. Mrs. Cook's second, fourth, and fifth assignments of error are sustained. Her third assignment of error, regarding waiver, is moot, and it is overruled on that basis.

## CONCLUSION

**{¶33}** Mr. Cook's death did not trigger Puritas's share-transfer restrictions. The judgment of the Lorain County Common Pleas Court is reversed, and this matter is remanded for proceedings consistent with this opinion.

Judgment reversed,<br>
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

CLAIR E. DICKINSON
FOR THE COURT

CARR, P. J.
BELFANCE, J.
CONCUR.


APPEARANCES:

STEPHEN W. FUNK, Attorney at Law, for Appellant.

RICHARD S. MITCHELL, Attorney at Law, for Appellant.

JOHN KEYSE-WALKER, Attorney at Law, for Appellee.

SHAWN W. MAESTLE, SAMUEL J. LAURICIA, III, and RANDY L. TAYLOR, Attorneys at Law, for Appellee.

DANIEL D. MASON, Attorney at Law, for Appellee.

GINO PULITO, Attorney at Law, for Appellee.