[Cite as *Robson v. Discount Drug Mart, Inc.*, 2023-Ohio-3291.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | |
|---|---|
| KYLE ROBSON | C.A. No.    22CA0049-M |
| Appellant/Cross-Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DISCOUNT DRUG MART, INC. | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellee/Cross-Appellant | CASE No.    18 CIV 0156 |

DECISION AND JOURNAL ENTRY

Dated: September 18, 2023

SUTTON, Presiding Judge.

{¶1}    Plaintiff-Appellant, Kyle Robson, appeals from the judgment of the Medina County Court of Common Pleas.  Additionally, Defendant-Appellee, Discount Drug Mart ("DDM"), has filed a conditional cross-appeal.  This Court affirms in part, reverses in part, and remands this matter for further proceedings.

I.

{¶2}    Mr. Robson worked at DDM from 1975 until 1984.  He began as a stockboy and quickly ascended through the company's ranks becoming vice president of operations and fulfilling many critical responsibilities.  During his tenure at the company, DDM issued Mr. Robson two stock certificates.  On November 25, 1980, he received 25 shares of stock pursuant to stock certificate number 44.  On February 29, 1984, he received an additional 225 shares of stock pursuant to stock certificate number 60.  It is undisputed that Mr. Robson received his additional 225 shares following a 10-to-1 stock split.

{¶3}   When Mr. Robson received his 225 shares in 1984, his stock certificate was accompanied by a letter from DDM's founder.  The letter indicated his new shares were "subject to the Stock Redemption Agreement entered into between [him] and [DDM]" at the time he received his original shares.  The letter also notified him that his stock certificate bore a related ledger on its reverse side.  The ledger provided: "[t]he transfer of this certificate is restricted by and subject to a Stock Redemption Agreement entered into between the owner hereof and [DDM]." An identical ledger appeared on the reverse side of Mr. Robson's 1980 stock certificate.  The 1984 letter included a signature line set above Mr. Robson's typewritten name.  DDM's founder asked Mr. Robson to sign and return the letter to reflect his acknowledgment that his shares were subject to a stock redemption agreement.  Rather than signing and returning the letter, Mr. Robson kept it.

{¶4}   When Mr. Robson voluntarily resigned from DDM in 1984, he kept his stock certificates.  Outside counsel for DDM contacted him about the certificates shortly after his departure.  According to Mr. Robson, outside counsel asked when he would be available to meet so that DDM could redeem his certificates.  Outside counsel indicated that, before his meeting with Mr. Robson could occur, he would have to speak with the company's founder, value Mr. Robson's shares, and prepare a check.  Mr. Robson had personally redeemed stock certificates from other DDM employees during his time with the company on at least two occasions, so he was aware of DDM's redemption procedures.  According to Mr. Robson, he confirmed his availability with outside counsel but never received any further communications from him or DDM regarding the return of his certificates.  Mr. Robson ultimately decided to retain the certificates and wait for DDM to contact him.

{¶5}   During the 1990s, DDM transitioned to new outside counsel.  Because prior outside counsel had acted as the custodian of its corporate records, the transition necessitated a review of

the company's files. At some point during that lengthy review process, DDM discovered it could not locate Mr. Robson's stock certificates. DDM knew Mr. Robson had been issued stock, but the corresponding file prior outside counsel should have created and maintained for him was missing. The limited records DDM had regarding Mr. Robson tended to show his shares/stock certificates were void and/or cancelled. Based on those limited records, the company's chief financial officer completed two affidavits in which he averred that Mr. Robson's certificates had been redeemed, Mr. Robson had been paid their full value, and the certificates had since been lost, stolen, or destroyed such that their whereabouts were unknown.

{¶6} DDM's founder passed away in 2015. Approximately six months after he died, Mr. Robson decided to contact DDM about his stock certificates. He asked DDM to confirm his current share ownership and provide records of any distributions and/or dividends issued since 1980. An exchange of letters ensued wherein DDM advised Mr. Robson that it did not consider him to be a current shareholder. DDM indicated that its records showed his stock certificates were void and his shares had been redeemed. Although DDM and Mr. Robson were unable to resolve the matter, Mr. Robson declined to take additional action at that time. He hired an attorney several years later, and his new attorney contacted DDM. When it became clear Mr. Robson and DDM were at an impasse, Mr. Robson filed suit.

{¶7} Mr. Robson filed suit against DDM for an injunction, breach of contract, quantum meruit, conversion, breach of fiduciary duty, fraud, and declaratory relief.[1] He sought an

---

[1] Mr. Robson also named 100 John Does as defendants. He identified the John Does as additional individuals he "believed to be Shareholders, Directors and/or Officers of DDM responsible to [him] for the events alleged in [his] Complaint and for [his] damages." Mr. Robson never amended his complaint to substitute any named individuals for the John Does, and the trial court ultimately dismissed his claims against John Does 1-100. Because Mr. Robson has not challenged that dismissal on appeal, we limit our discussion to his claims against DDM.

injunction to require DDM to (1) give him access to and allow him to copy its books, records of account, minutes, and shareholder records; and (2) produce a copy of any signed, written instrument containing a restriction on his right to transfer his shares. He asked the trial court to declare that he was the owner of 250 shares of DDM stock, plus any dividends, and that he was entitled to any wrongfully withheld dividends and distribution payments from February 29, 1984, to present. Mr. Robson also sought damages, including statutory damages, costs, and attorney fees. DDM responded to his complaint by filing an answer and a counterclaim alleging fraud.

{¶8} By agreement of the parties, the lower court bifurcated Mr. Robson's claims for trial. A trial before a magistrate occurred solely on his claim for declaratory judgment. The magistrate found Mr. Robson was a shareholder of 250 shares of DDM stock and entered declaratory judgment in his favor. DDM filed objections to the magistrate's decision, and Mr. Robson filed a response. The trial court overruled DDM's objections and adopted the magistrate's decision. DDM then appealed, but this Court dismissed its appeal. This Court found the trial court's judgment entry did not fully resolve Mr. Robson's claim for declaratory relief as it did not determine whether he was entitled to dividends or distributions. *See Robson v. Discount Drug Mart, Inc.*, 9th Dist. Medina No. 19CA0055-M (Mar. 11, 2020). Consequently, we dismissed DDM's appeal for lack of a final, appealable order.

{¶9} Following our dismissal, the magistrate conducted a second trial to resolve Mr. Robson's outstanding claims and DDM's counterclaim. At the close of Mr. Robson's evidence, DDM moved to dismiss his claims under Civ.R. 41(B)(2). The magistrate ordered the parties to brief that motion, and the parties complied. The magistrate then issued a decision, and both parties filed objections, responses, and replies. On review of the magistrate's decision, the trial court

found that the magistrate had failed to adjudicate all the issues presented at trial. The trial court rejected the magistrate's decision and remanded the matter to the magistrate.

{¶10} Subsequently, the magistrate issued an amended decision and ruled on the pending claims and counterclaim. The magistrate found Mr. Robson was the owner of 3,000 shares of DDM stock based on his original 25 shares and stock splits that occurred in 1984, 1989, and 1999. The magistrate found those 3,000 shares were unrestricted and constituted a "separate and distinct class of stock" because DDM had failed to prove Mr. Robson was subject to any valid stock redemption agreement. The magistrate also found, however, that there was no contract between DDM and Mr. Robson apart from the stock certificates themselves, meaning DDM was not obligated to redeem them. Moreover, the magistrate found Mr. Robson had failed to set forth evidence to establish the value of his unique and unrestricted shares. The magistrate determined that Mr. Robson's claim for breach of contract only entitled him to declared dividends on his shares in the amount of $1,857.50, plus statutory interest. The magistrate declined to award him any additional damages or attorney fees. Because Mr. Robson prevailed on his claim for breach of contract, the magistrate found his claim for quantum meruit moot. The magistrate entered judgment in favor of DDM on Mr. Robson's claims for injunctive relief, conversion, breach of fiduciary duty, and fraud. The magistrate entered judgment in favor of Mr. Robson on DDM's counterclaim for fraud.

{¶11} Both parties filed objections to the magistrate's decision as well as responses and replies. Upon review, the trial court overruled the objections and entered judgment on the magistrate's decision. Mr. Robson then filed this appeal. Additionally, DDM filed a conditional cross-appeal.

{¶12}  Mr. Robson's appeal is now before this Court and contains five assignments of error for review.  DDM's conditional cross-appeal is also before this Court and contains four assignments of error for review.  DDM has indicated that this Court need only address its cross-appeal if this Court reverses or otherwise modifies the trial court's judgment in favor of Mr. Robson.  Because this matter must be remanded in part, this Court finds it necessary to address the cross-appeal.  Moreover, because the cross-appeal challenges the lower court's foundational determination that Mr. Robson is a shareholder of DDM, we find it necessary to begin by addressing the cross-appeal.  To facilitate our review, we combine several of DDM's assignments of error.

## II.

### DDM'S ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED, THROUGH ITS JUNE 18, 2019 JOURNAL ENTRY (WHICH WAS FULLY INCORPORATED INTO THE TRIAL COURT'S AUGUST 1, 2022 JOURNAL ENTRY), WHEN IT AFFIRMED THE APRIL 15, 2019, MAGISTRATE'S DECISION BY FINDING THAT DDM PRESENTED NO CONTEMPORANEOUS EVIDENCE REFLECTING THAT [MR. ROBSON'S] SHARES WERE REDEEMED AFTER HE SEPARATED FROM DDM IN 1984.**

### DDM'S ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED, THROUGH ITS JUNE 18, 2019 JOURNAL ENTRY (WHICH WAS FULLY INCORPORATED INTO THE TRIAL COURT'S AUGUST 1, 2022 JOURNAL ENTRY), WHEN IT AFFIRMED THE APRIL 15, 2019, MAGISTRATE'S DECISION BY OVERLOOKING EVIDENCE DEMONSTRATING THAT [MR.] ROBSON ADMITTED THAT HE EXECUTED A STOCK REDEMPTION AGREEMENT.**

### DDM'S ASSIGNMENT OF ERROR III

**THE TRIAL COURT ERRED, THROUGH ITS JUNE 18, 2019 JOURNAL ENTRY (WHICH WAS FULLY INCORPORATED INTO THE TRIAL COURT'S AUGUST 1, 2022 JOURNAL ENTRY), WHEN IT AFFIRMED THE APRIL 15, 2019, MAGISTRATE'S DECISION BY FAILING TO RECOGNIZE THAT THE EXECUTION OF A STOCK REDEMPTION**

**AGREEMENT WAS A CONDITION PRECEDENT TO ANY PURPORTED CONTRACT BETWEEN [MR.] ROBSON AND DDM.**

{¶13} In each of the foregoing assignments of error, DDM challenges the lower court's ruling that Mr. Robson is a shareholder. First, DDM argues the lower court erred when it found that DDM failed to present any contemporaneous evidence proving it redeemed Mr. Robson's shares shortly after he resigned in 1984. Second, DDM argues the lower court erred when it ignored evidence that Mr. Robson admitted he executed a stock redemption agreement. Third, DDM argues the lower court erred when it failed to recognize that Mr. Robson's execution of a stock redemption agreement was a condition precedent to any contract with DDM. This Court will address each of DDM's arguments in turn. For ease of analysis, however, this Court reorders DDM's second and third arguments.

{¶14} This Court generally reviews a trial court's decision to adopt a magistrate's decision for an abuse of discretion. *Barlow v. Barlow*, 9th Dist. Wayne No. 08CA0055, 2009-Ohio-3788, ¶ 5. "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. To the extent DDM's assignments of error challenge factual findings on the part of the lower court, this Court reviews those findings under a manifest weight of the evidence standard. *See I.R. v. D.R.*, 9th Dist. Wayne No. 22AP0012, 2023-Ohio-1427, ¶ 8. In doing so, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

Proof of Redemption

{¶15} "[T]he issuance of a share certificate is not always required to create a shareholder relation." *Shuman v. Shuman*, 9th Dist. Summit No. 17572, 1996 WL 455975, *2 (Aug. 14, 1996). *Accord Cassidy v. Ellerhorst*, 110 Ohio St. 535, 545 (1924). Even so, "[p]ossession of certificates generally creates [] a presumption that the holder is the owner of the represented shares." *Algren v. Algren*, 183 Ohio App.3d 114, 2009-Ohio-3009, ¶ 22 (2d Dist.). "'If the corporation disputes that ownership, it has the burden of proof to overcome that presumption by the production of evidence sufficient for that purpose.'" *Bitonte v. Tiffin Savings Bank*, 65 Ohio App.3d 734, 737 (3d Dist.1989), quoting 12 Ohio Jurisprudence 3d, Business Relationships, Section 490 (1979) now 12 Ohio Jurisprudence 3d, Business Relationships, Section 527.

{¶16} It is undisputed that Mr. Robson is in possession of two DDM stock certificates. The first, dated November 25, 1980, certifies that he is the owner of 25 shares of DDM stock. The second, dated February 29, 1984, certifies that he is the owner of 225 shares of DDM stock. The lower court found the stock certificates created a presumption of ownership in his favor. The lower court further found DDM failed to tender evidence sufficient to overcome that presumption. DDM only challenges the lower court's second finding (i.e., that DDM failed to overcome the presumption in favor of Mr. Robson). According to DDM, it proved it redeemed Mr. Robson's shares in 1985.

{¶17} Mr. Robson testified that he never paid DDM for the stock certificate he received in 1980. It was his understanding the certificate was given to him "as a reward incentive." Further, he did not recall ever being presented with a stock redemption agreement to sign. Mr. Robson admitted that both his certificates had a ledger on their reverse side referencing a stock redemption agreement and restriction on transfer. He also admitted that his certificate for 225 shares came

with a letter from DDM's founder, asking him to sign and return the letter to acknowledge his new shares were subject to the stock redemption agreement he had executed when he received his original 25 shares. Again, however, Mr. Robson did not recall ever executing a stock redemption agreement. He testified that he kept the founder's letter and never signed it. He also testified that he did not realize other employees had executed stock redemption agreements and that the first time he saw a copy of one was during this litigation. While Mr. Robson knew DDM had a process for reacquiring its stock certificates, he indicated that he did not realize redemption was mandatory.

{¶18} Mr. Robson testified that, during his tenure with DDM, outside counsel maintained the company's shareholder records. After Mr. Robson resigned, outside counsel contacted him to arrange a meeting to redeem his certificates. According to Mr. Robson, he confirmed his availability with outside counsel, but outside counsel never contacted him again. Mr. Robson testified that DDM never paid him for his shares. To the extent DDM claimed its records evidenced proof of payment, Mr. Robson insisted those records were inaccurate. He testified that he was certain DDM would only have paid him for his shares if he had returned his stock certificates. He explained that he had collected stock certificates from other employees on at least two occasions and DDM's founder was adamant that "you didn't hand somebody a check unless they gave you [their] shares." Mr. Robson testified: "I don't think anyone in the history of the company ever got a check for their stock without surrendering the shares."

{¶19} To rebut Mr. Robson's testimony and the presumption of ownership in his favor, DDM presented the testimony of Thomas McConnell and several exhibits. Mr. McConnell began working at DDM in 1989 as its vice president of finance. He eventually became the company's senior vice president of finance and chief financial officer. He testified that, when he began at DDM, the company relied on outside counsel to maintain its shareholder records. After the

company ended its relationship with outside counsel in the early 1990s, Mr. McConnell oversaw any shareholder-related issues. He confirmed that he was the best source at DDM to testify about any financial matters, including matters related to its stock certificates.

{¶20} Mr. McConnell explained that, historically, DDM had two types of plans involving its stock: a stock dollar liquidation plan and an employee stock option plan. The former was a profit-sharing plan wherein the plan itself owned stock and employees would receive plan credit based on years of service, hours worked, and other factors. Under the latter plan, the company would extend an offer to eligible employees to purchase stock themselves. Mr. McConnell testified that DDM's founder and its Board of Directors would make a list of eligible employees and have outside counsel draft letters to send to those employees. The letters would explain that the employees had the option of purchasing a specific number of shares within a five-year period. If an eligible employee chose to exercise the option, the company would collect payment on the purchased shares and notify outside counsel. Outside counsel would then issue a stock certificate and generate a shareholder file for the employee.

{¶21} Mr. McConnell testified that, at the time Mr. Robson worked for DDM, the employee stock option plan was the only way employees could own stock themselves. To his knowledge, no DDM employee had ever been gifted stock. Likewise, he was not aware of any employee leaving the company without surrendering their stock. Mr. McConnell worked alongside DDM's founder for many years before the founder died in 2015. According to Mr. McConnell, the founder firmly believed only current employees should own stock. Indeed, the founder even required his own family members to surrender their stock if they resigned. Mr. McConnell testified that the first time a non-employee acquired an ownership interest in DDM

stock was in the late 2010s. That situation arose after DDM's founder died and the probate court awarded his stock to two of his siblings as part of his estate settlement.

**{¶22}** Mr. McConnell indicated that DDM first discovered Mr. Robson's stock certificates were missing in the late 1990s. At that time, DDM had broken ties with outside counsel and was conducting a file audit. When Mr. McConnell learned Mr. Robson's certificates were missing, he reviewed DDM's records. His review left him satisfied that DDM had redeemed Mr. Robson's shares, so he completed two affidavits on June 22, 1998. In the first, he averred that DDM had redeemed Mr. Robson's stock certificate for 25 shares on October 26, 1984, the date Mr. Robson had resigned. In the second, he likewise averred that DDM had redeemed Mr. Robson's stock certificate for 225 shares on October 26, 1984. In each affidavit, Mr. McConnell averred that Mr. Robson had been paid the full value of his shares at the time of redemption and his stock certificate had since been lost, stolen, or destroyed such that their current whereabouts were unknown.

**{¶23}** Apart from Mr. McConnell's testimony, DDM introduced several exhibits to support its position that it had redeemed Mr. Robson's shares. First, DDM introduced copies of its shareholder ledgers. A current ledger created for the purpose of this litigation did not list Mr. Robson as shareholder. Likewise, an older ledger setting forth DDM's shareholders of record as of February 15, 2003, did not list him as a shareholder. A historical ledger setting forth DDM's former shareholders of record listed Mr. Robson's shares as void. Finally, another historical ledger setting forth DDM's share certificates of record listed each of Mr. Robson's certificates as cancelled with a surrender date of October 26, 1984 (i.e., the date he resigned). Accordingly, none of the ledgers reflected that Mr. Robson was a current shareholder.

{¶24} Second, DDM introduced a single, typewritten page dated March 31, 1986, and titled "Shareholders' Equity Analysis" (hereinafter "Exhibit G"). Mr. McConnell testified that he found Exhibit G when he searched DDM's records in response to Mr. Robson's inquiries about his shareholder status. The exhibit listed Mr. Robson's name under the category of "Stock Redeemed." It listed the number of his shares as 250. Under a column entitled "Total Shareholders Equity," the exhibit reflected a negative equity of "-8,170." Minutes from a 1984 meeting of DDM's Board of Directors showed that, for the year 1985, DDM's stock was valued at $32.68 per share. Because $32.68 per share multiplied by 250 shares equaled $8,170, DDM argued that Exhibit G evidenced the fact that DDM had paid Mr. Robson $8,170 for his shares in 1985.

{¶25} DDM also introduced several exhibits that the magistrate ultimately excluded. Exhibit I was a letter DDM received from its auditor regarding the market value of its stock in 1984 and its stock dollar liquidation plan. The letter included an attachment showing Mr. Robson had an interest in the stock dollar liquidation plan amounting to a little over $4,500. Exhibits M, N, and O were examples of stock option letters DDM's outside counsel sent to employees in the 1980s, notifying them of an available stock option and informing them the option was contingent upon them executing a stock redemption agreement. The magistrate refused to admit Exhibits I, M, N, and O because they were created by an outside entity or person and Mr. McConnell could not properly authenticate them.

{¶26} In challenging the lower court's ultimate determination that it did not produce evidence sufficient to overcome the presumption of ownership in favor of Mr. Robson, DDM takes issue with several individual aspects of the lower court's decision. DDM argues the trial court erred when it adopted the magistrate's decision because (1) the magistrate committed an error of law by refusing to admit several of DDM's exhibits; (2) the trial court essentially ignored the

evidentiary value of Exhibit G; and (3) the weight of the evidence tended to show DDM redeemed Mr. Robson's shares shortly after his resignation. This Court addresses each argument separately.

**{¶27}** DDM argues the trial court erred when it adopted the magistrate's decision to exclude Exhibits I, M, N, and O because, as a matter of law, those exhibits were admissible. Even assuming the lower court erred by not admitting the exhibits, however, the record reflects its error was harmless. *See* Civ.R. 61. Exhibit I concerned DDM's stock dollar liquidation plan, not its employee stock option plan. Only the latter plan was at issue at trial. Moreover, to the extent Exhibit I proved the value of DDM's stock in 1984, DDM offered other proof of that value in the form of minutes from a 1984 Board of Directors meeting. As for Exhibits M, N, and O, none of those exhibits concerned Mr. Robson. DDM was never able to locate a copy of any stock option letter sent to him at the time he received his original shares. While Exhibits M, N, and O were evidence that DDM generally required employees to execute stock redemption agreements in connection with stock options, DDM produced other evidence to that effect. Mr. McConnell repeatedly testified that (1) DDM's founder never gifted stock to anyone, (2) only current employees could own stock, and (3) employees were required to surrender their stock if they left the company. Upon review, DDM has not shown the exclusion of Exhibits I, M, N, and O affected its substantial rights. *See id.*

**{¶28}** As to DDM's claim that the trial court ignored Exhibit G, the record reflects the trial court considered the exhibit but was not persuaded that it established the redemption of Mr. Robson's shares. The trial court noted that it appeared the exhibit had been prepared by an unknown DDM employee at some point in 1986, more than a year after Mr. Robson had resigned. While the exhibit was admissible, the court found its admissibility did not "automatically give [it] any type of superior evidentiary value." Rather, the court weighed the exhibit against all the other

evidence at trial.  Upon review, the record does not support DDM's claim that the trial court failed to afford Exhibit G any evidentiary value.

{¶29}  Finally, we cannot conclude the lower court lost its way when it found DDM did not produce evidence sufficient to overcome the presumption of ownership in favor of Mr. Robson. Mr. Robson had physical possession of his stock certificates and testified that DDM never redeemed them.  Moreover, testimony from both Mr. Robson and Mr. McConnell tended to establish that it would have been highly unusual for DDM to pay an employee for their shares without physically redeeming their stock certificates.  While the company's ledgers indicated Mr. Robson's shares/stock certificates were void and/or cancelled and he was not a shareholder, Mr. McConnell could not definitively say whether DDM had amended its ledgers based on the affidavits he completed in 1998.  DDM also was unable to produce a copy of a stock option letter or stock redemption agreement for Mr. Robson.  In fact, DDM admitted that Mr. Robson's entire shareholder file was missing.  Mr. McConnell did not begin working at DDM until after Mr. Robson resigned, so he lacked personal knowledge as to whether the company had redeemed Mr. Robson's shares.  Further, DDM chose not to call its former outside counsel as a witness.  The trial court was presented with extremely limited documentary evidence from DDM.  Meanwhile, the lower court heard Mr. Robson testify that (1) he did not recall ever executing a stock redemption agreement, (2) outside counsel never followed through to redeem his shares, (3) he was never paid for his shares, and (4) he still had physical possession of his stock certificates and the unsigned letter that accompanied his 1984 certificate.  Based on the foregoing, the lower court reasonably could have concluded that DDM did not produce sufficient evidence to overcome the presumption of ownership in favor of Mr. Robson.  *See Bitonte*, 65 Ohio App.3d at 737, quoting 12 Ohio

Jurisprudence 3d, Business Relationships, Section 490 (1979) now 12 Ohio Jurisprudence 3d, Business Relationships, Section 527. Accordingly, DDM's first assignment of error is overruled.

Condition Precedent

{¶30} In its third assignment of error, DDM argues the lower court erred by failing to recognize that the execution of a stock redemption agreement was a condition precedent to the formation of any contract between it and Mr. Robson. As previously noted, Mr. Robson's stock certificates contained a ledger on their reverse sides. Both ledgers provided: "[t]he transfer of this certificate is restricted by and subject to a Stock Redemption Agreement entered into between the owner hereof and [DDM]." DDM points to the ledgers as evidence that it and Mr. Robson intended for any contractual relationship between them to be contingent upon a stock redemption agreement. According to DDM, if Mr. Robson failed to execute a stock redemption agreement, his failure to do so precluded the formation of a contract between them. DDM argues that the lower court erred when it found the parties had a contract in the absence of a stock redemption agreement.

{¶31} The lower court specifically found the restrictive ledger on the back side of Mr. Robson's certificates was "invalid as a matter of law pursuant to former R.C. 1701.35(B) in effect in 1984." It further found that, even if DDM intended the execution of a stock redemption agreement to be a condition precedent to the formation of any contract between it and Mr. Robson, the company waived that condition by issuing him stock certificates without ensuring he had signed such an agreement. "In Ohio, the general rule is that the performance of a condition precedent may be waived by the party to whom the benefit of the condition runs." *Peto v. Ruschak*, 9th Dist. Summit No. 27614, 2015-Ohio-5538, ¶ 12. DDM has not addressed the trial court's finding that it waived the execution of its purported condition precedent by issuing Mr. Robson

his stock certificates without ensuring that he executed a stock redemption agreement. This Court will not construct an argument on its behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). Because DDM has not shown the trial court erred when it rejected DDM's condition precedent argument, DDM's third assignment of error is overruled.

Admission of Stock Redemption Agreement

**{¶32}** In its second assignment of error, DDM argues the lower court erred when it overlooked certain admissions on the part of Mr. Robson. According to DDM, Mr. Robson's former counsel admitted in a letter to DDM that Mr. Robson had executed a stock redemption agreement. Further, Mr. Robson acknowledged that the ledgers on the reverse side of his stock certificates referenced a binding stock redemption agreement. According to DDM, the foregoing admissions were sufficient to prove Mr. Robson either executed a stock redemption agreement or knew his shares had to be surrendered at the time of his resignation.

**{¶33}** In ruling on Mr. Robson's objections to the magistrate's decision, the trial court found that Mr. Robson never admitted he executed a stock redemption agreement. A review of the record reveals the court's finding is not against the manifest weight of the evidence. *See I.R.*, 2023-Ohio-1427, at ¶ 8. Mr. Robson's former counsel wrote the following to DDM in a letter dated October 13, 2015:

> Mr. Robson believes that he did execute a Stock Redemption Agreement, although he does not have a copy of the agreement or any option award letters, and can't be expected to remember the respective rights and obligations of DDM and Mr. Robson in those documents.

When asked about the letter at trial, Mr. Robson denied telling his former attorney that he thought he had executed a stock redemption agreement. He testified:

> The response I gave to [my former counsel] was that if I had been asked to execute a stock redemption agreement, would I have done so? I said, "Yeah, if I had been given one, I would have."

Thus, Mr. Robson explained the statement in his former counsel's letter. He also maintained that he did not recall ever signing any documents in connection with his stock certificates. Based on the foregoing, we cannot say the trial court clearly lost its way and created a manifest miscarriage of justice when it found that Mr. Robson never admitted he executed a stock redemption agreement. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20.

{¶34} Regarding Mr. Robson's knowledge of the ledgers on the reverse side of his stock certificates, the lower court found DDM waived any stock redemption agreement restriction by issuing Mr. Robson stock certificates without ensuring he had signed such an agreement. *See* Discussion, *supra*. DDM was unable to produce a stock redemption agreement for Mr. Robson, and Mr. Robson maintained that he did not recall ever being presented with one. If DDM waived Mr. Robson's execution of a stock redemption agreement, then his knowledge of the restrictive language on the reverse side of his certificates was inapposite. DDM has not shown the trial court overlooked certain admissions on the part of Mr. Robson. Thus, DDM's second assignment of error is overruled.

### DDM'S ASSIGNMENT OF ERROR IV

**THE TRIAL COURT ERRED, THROUGH ITS JUNE 18, 2019 JOURNAL ENTRY (WHICH WAS FULLY INCORPORATED INTO THE TRIAL COURT'S AUGUST 1, 2022 JOURNAL ENTRY), WHEN IT AFFIRMED THE APRIL 15, 2019, MAGISTRATE'S DECISION BY CONCLUDING THAT [MR.] ROBSON'S CLAIMS WERE NOT SUBJECT TO THE DEFENSE OF LACHES.**

{¶35} In its fourth assignment of error, DDM argues the lower court erred by refusing to find Mr. Robson's claims were barred by the defense of laches. We do not agree.

**{¶36}** "Laches is an equitable doctrine, commonly invoked as an affirmative defense, where a party's inexcusable delay in asserting a claim causes undue detriment to the adverse party." *Marquez v. Jackson*, 9th Dist. Lorain No. 16CA011049, 2018-Ohio-346, ¶ 17. "The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *State ex rel. Polo v. Cuyahoga County Bd. of Elections*, 74 Ohio St.3d 143, 145 (1995). "Delay in asserting a right does not of itself constitute laches * * *." *Smith v. Smith*, 168 Ohio St. 447 (1959), paragraph three of the syllabus. "Instead, the proponent must demonstrate that he or she has been materially prejudiced by the unreasonable and unexplained delay of the person asserting the claim." *Post v. Caycedo*, 9th Dist. Summit No. 23769, 2008-Ohio-111, ¶ 9.

**{¶37}** "Whether or not to apply the defense of laches is within the discretion of the trial court and is not overturned absent an abuse of discretion." *Barker v. Jarrell*, 9th Dist. Lorain No. 07CA009126, 2007-Ohio-7024, ¶ 7. *See also Tabatabai*, 2009-Ohio-3139, at ¶ 18 (actions on magistrate's decision reviewed with reference to nature of the underlying matter). An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶38}** The lower court rejected DDM's argument that Mr. Robson's claims were barred by the defense of laches. In overruling DDM's objections to the magistrate's decision, the trial court found that, until 2015, Mr. Robson had no reason to suspect DDM did not consider him to be a shareholder. Mr. Robson had possession of his certificates and maintained that DDM never

19

redeemed them for value. The trial court found Mr. Robson offered a reasonable explanation for his delay in asserting his rights and was not the primary cause of any prejudice DDM suffered as a result of the delay. The court found DDM was unable to rebut the presumption of ownership in favor of Mr. Robson due to its failure to maintain its own records. DDM was unable to produce any stock option agreement letter, stock redemption agreement, or record of any redemption pertaining to Mr. Robson apart from a single page printout from 1986 (i.e., Exhibit G). When DDM discovered Mr. Robson's stock certificates were missing in the late 1990s, it only conducted a brief investigation and formed its own conclusions based on limited information. Moreover, if DDM did redeem Mr. Robson's stock in the 1980s as it claimed, the court found DDM failed to follow its own policies by requiring Mr. Robson to surrender his stock certificates at that time. Because Mr. Robson did not unreasonably delay in asserting his rights and, in any event, DDM failed to establish his delay caused it material prejudice, the trial court rejected DDM's laches defense.

{¶39} DDM argues the trial court erred by overruling its objections to the magistrate's decision and refusing to apply the defense of laches to Mr. Robson's claims. DDM maintains it was unreasonable for Mr. Robson to wait thirty years to assert his shareholder rights. Mr. Robson knew his share certificates were in his possession, knew they were subject to redemption, and failed to follow up with that redemption process after outside counsel contacted him. Instead, he waited until DDM's founder died to assert his claims, at which point the founder could no longer testify about his policies and the certificates in Mr. Robson's possession. DDM insists Mr. Robson's delay caused it material prejudice because its founder could no longer testify and, after thirty years, neither its bank, nor Mr. Robson's bank could produce cancelled checks or any other records evidencing proof of payment on Mr. Robson's shares. According to DDM, the lower court

essentially "gave [Mr.] Robson a 'free pass'" by faulting DDM for not maintaining its own records when Mr. Robson's unreasonable delay was the reason the company could not secure the records it needed.

{¶40} Having reviewed the record, we cannot conclude the lower court went so far as to abuse its discretion by rejecting DDM's defense of laches. *See Barker*, 2007-Ohio-7024, at ¶ 7; *Tabatabai*, 2009-Ohio-3139, at ¶ 18. Mr. Robson testified that he kept his stock certificates because he was not aware of a mandatory redemption policy and assumed DDM would reach out to him at some point. He maintained that he did not purchase his shares and did not recall ever executing an agreement in connection with them. While DDM produced evidence of its general redemption policies, it failed to produce any evidence directly related to Mr. Robson. The company admitted it could not find his shareholder file. There was no evidence of any signed agreement requiring Mr. Robson to surrender his shares.

{¶41} Regarding the significant delay that occurred between the time Mr. Robson left DDM and the time he inquired about his shareholder status, Mr. Robson explained the reason behind the delay and his decision to finally contact DDM. He testified that, after leaving DDM, he had a new job, traveled significantly, and was very active. He also described DDM's founder as an "aggressive person" and felt it was best to wait until DDM chose to reach out to him. Mr. Robson testified that he was diagnosed with cancer in 2014 and his diagnosis prompted him to get his affairs in order. Not long after, DDM's founder died, and Mr. Robson understood DDM had no intention of contacting him about his stock certificates. The culmination of his own health crises and the death of DDM's founder caused Mr. Robson to finally reach out to DDM to inquire about his shareholder status. While DDM claims Mr. Robson purposely delayed his inquiry to place DDM in an untenable position, we cannot conclude the lower court abused its discretion by

rejecting its argument, accepting Mr. Robson's explanation for his actions, and concluding Mr. Robson did not engage in an unreasonable or unexplained delay. *See State ex rel. Polo*, 74 Ohio St.3d at 145.

{¶42} Regarding material prejudice to DDM, we likewise cannot conclude the trial court abused its discretion by rejecting DDM's laches defense. Mr. Robson did not prevent DDM from maintaining records related to him or ensuring it collected his stock certificates when he resigned. Further, any claim that additional records would have existed had Mr. Robson asserted his rights earlier is entirely speculative. *See State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 54 ("[S]peculation cannot prove prejudice."). Both sides described DDM's redemption policy, indicating it would have been highly unusual for the company to pay a former employee for their shares without redeeming their stock certificates. Moreover, while Mr. McConnell testified Mr. Robson's shareholder file was missing, he also admitted that he could not say for sure whether DDM had *ever* created a file for him. If Mr. Robson was never sent a stock option letter, if he never signed a stock redemption agreement, and if DDM never issued him a check to redeem his shares, then DDM would not have been able to procure those items at any point, regardless of Mr. Robson's delay in asserting his rights. Upon review, DDM has not shown the trial court abused its discretion in rejecting its defense of laches. Accordingly, DDM's fourth assignment of error is overruled.

### MR. ROBSON'S ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED WHEN IT AFFIRMED THE MAGISTRATE'S DECISION ON [MR.] ROBSON'S CLAIM FOR AN INJUNCTION DUE TO DDM'S VIOLATION OF R.C. 1701.37.**

{¶43} In his first assignment of error, Mr. Robson argues the lower court erred when it found he was not entitled to injunctive relief. Specifically, he claims the lower court abused its

discretion by not ordering DDM to produce records he requested as a shareholder pursuant to R.C. 1701.37(C). For the following reasons, we overrule his assignment of error.

**{¶44}** As previously noted, this Court reviews a trial court's action on a magistrate's decision with reference to the nature of the underlying matter. *Tabatabai*, 2009-Ohio-3139, at ¶ 18. "The grant or denial of an injunction is within the trial court's discretion and will not be disturbed by a reviewing court absent an abuse of that discretion." *Heron Point Condominium Unit Owner's Assn. v. E.R. Miller, Ltd.*, 9th Dist. Summit Nos. 25861, 25863, 25998, 2012-Ohio-2171, ¶ 15. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

**{¶45}** A corporation must "keep correct and complete books and records of account, together with minutes of the proceedings of its incorporators, shareholders, directors, and committees of the directors, and records of its shareholders * * *." R.C. 1701.37(A). R.C. 1701.37(C) provides, in relevant part:

> Any shareholder of the corporation, upon written demand stating the specific purpose thereof, shall have the right to examine in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose, the articles of the corporation, its regulations, its books and records of account, minutes, and records of shareholders aforesaid, and voting trust agreements, if any, on file with the corporation, and to make copies or extracts thereof.

*Accord No-Burn, Inc. v. Murati*, 9th Dist. Summit No. 25495, 2011-Ohio-5635, ¶ 17 (shareholders have the right to inspect corporate records unless their stated purpose is unreasonable or improper). "Injunction is the proper form of remedy to enforce the right of a stockholder in a private corporation * * * to inspect the books and records of the corporation." *Cincinnati Volksblatt Co. v. Hoffmeister*, 62 Ohio St. 189 (1900), paragraph one of the syllabus. *Accord State ex rel. Schafer v. Citizens Nat. Bank of Ironton*, 168 Ohio St. 535, 536 (1959).

{¶46} Mr. Robson presented evidence that he first invoked R.C. 1701.37(C) and made a formal request to review DDM's records in September 2015. He asked to review the company's records "for the purpose of determining the value of his shares and actions taken that have affected his shares * * * including shareholder meetings, dividends, stock splits or other company changes." Mr. Robson made several similar requests both before and after he filed suit against DDM. While DDM provided Mr. Robson with documents during discovery, it otherwise opposed his written requests. It was the company's position that Mr. Robson was not entitled to inspect its records pursuant to R.C. 1701.37(C) because he was not a shareholder. DDM took the position that it had redeemed Mr. Robson's shares when he resigned from the company.

{¶47} Although the magistrate found Mr. Robson was a shareholder, the magistrate declined to award him injunctive relief. The magistrate noted that DDM had produced evidence in support of its position that Mr. Robson was not a shareholder and had explained its rationale for denying his records requests. The magistrate stressed that the reason Mr. Robson had prevailed on his claim for declaratory relief was that several of DDM's exhibits had been excluded on admissibility grounds. The magistrate further stressed that the court had yet to issue a final, appealable order regarding Mr. Robson's shareholder status. Accordingly, each time Mr. Robson requested documents from DDM pursuant to statute, his shareholder status had still been a point of contention. The magistrate ultimately concluded that DDM "did not violate the spirit and purpose of R.C. 1701.37 by denying [Mr.] Robson access to its records" because it had "a good faith belief" he was not a shareholder. The trial court adopted the magistrate's findings of fact and conclusions of law in full and determined that Mr. Robson was not entitled to injunctive relief.

{¶48} Mr. Robson argues the lower court erred when it denied his request for injunctive relief and refused to order DDM to produce the records he requested. He maintains that, as a

shareholder of DDM, he had a statutory right to inspect its records upon request. He claims his request was reasonable and proper, so DDM had to honor it. He notes that DDM never produced all the records he requested. According to Mr. Robson, "[r]egardless of determining the value of [his] shares, [he] is entitled to information regarding actions taken that have affected his shares of which he is not aware, as he has not received adequate notice: including shareholders meetings, dividends, stock splits or other company changes."

{¶49} Even assuming the lower court erred by not issuing an injunction in favor of Mr. Robson once it declared him a shareholder, this Court cannot conclude that Mr. Robson has established resulting prejudice. To secure a reversal of a judgment on appeal, "an aggrieved party must demonstrate both error and resulting prejudice." *Princess Kim, L.L.C. v. U.S. Bank, N.A.*, 9th Dist. Summit No. 27401, 2015-Ohio-4472, ¶ 18. *Accord Smith v. Flesher*, 12 Ohio St.2d 107 (1967), paragraph one of the syllabus. "Only error which affects or presumptively affects the final outcome of the case is prejudicial." *Princess Kim, L.L.C.* at ¶ 18. Upon review, Mr. Robson has not adequately explained how DDM's failure to respond to his demands under R.C. 1701.37(C) affected the final outcome in this matter.

{¶50} The record reflects that DDM produced a wealth of information during discovery. Mr. Robson received a 1986 shareholder equity analysis relating to him (i.e., Exhibit G), a report of stock value in 1984 and the amounts DDM paid employees who left the company in 1984-1985 on their stock dollar liquidation plans, historical shareholder ledgers in redacted form, more recent shareholder ledgers in redacted form, examples of stock option letters and stock redemption agreements issued to other employees, stock valuation reports performed by an independent valuation firm and relied on by DDM in valuing its stock, the Form 5500 Annual Return/Report of Employee Benefit Plan DDM filed with the Department of Labor to report its stock value, a

copy of financial statements and independent auditor's report related to DDM's employee stock ownership plan and trust, documents evidencing DDM's stock split history, documents evidencing its dividend history, and the minutes of various special and regular meetings of its Board of Directors. Mr. Robson never claimed he was unable to proceed with trial due to DDM's failure to produce additional evidence. Indeed, in moving to refer the matter to mediation before trial, Mr. Robson wrote that he had "obtained sufficient information from DDM to determine a value on [his] shares."

**{¶51}** Mr. Robson has not explained how DDM's failure to comply with his written demands under R.C. 1701.37(C) impacted his ability to litigate his claims. He vaguely asserts that DDM has not produced all the information he requested and that he has a right to information "regarding actions taken that have affected his shares of which he is not aware * * *." At the same time, however, he seeks statutory damages against DDM based on its failure to maintain records. DDM cannot produce records that do not exist. Mr. Robson has made no attempt to identify any particular records that (1) are currently in DDM's possession, and (2) were necessary to prove his claims. Moreover, at no point has he suggested this matter must be remanded for retrial because, absent an injunction and DDM's production of certain records, his arguments are premature and/or he is unable to establish trial court error. This Court will not craft an argument on his behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8. Even assuming the lower court erred by not issuing an injunction, Mr. Robson has not established resulting prejudice. Accordingly, Mr. Robson's first assignment of error is overruled.

## MR. ROBSON'S ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED WHEN IT PARTIALLY AFFIRMED THE MAGISTRATE'S DECISION ON [MR.] ROBSON'S CLAIM FOR BREACH OF CONTRACT AND QUANTUM MERUIT.**

**{¶52}** In his second assignment of error, Mr. Robson argues the lower court erred when it failed to rule in his favor on several aspects of his claims for breach of contract and quantum meruit. For ease of analysis, this Court addresses each of his individual arguments in turn.

**{¶53}** Once again, this Court reviews the trial court's action on the magistrate's decision with reference to the nature of the underlying matter. *Tabatabai*, 2009-Ohio-3139, at ¶ 18. To the extent Mr. Robson challenges factual findings on the part of the lower court or the weight of the evidence, this Court reviews his arguments under a manifest weight of the evidence standard. *See I.R.*, 2023-Ohio-1427, at ¶ 8. To the extent he argues the lower court misapplied the law, this Court reviews his arguments de novo. *See Dietrich v. Core*, 9th Dist. Summit Nos. 30349, 30528, 2023-Ohio-1463, ¶ 19.

<u>Duty to Maintain Records and Statutory Damages</u>

**{¶54}** Mr. Robson argues DDM breached its contract with him as a shareholder by failing to comply with R.C. 1701.37(A). He notes that DDM was unable to produce any shareholder records predating 2003, its records inaccurately reflected his stock certificates were void, and DDM was unable to produce a copy of any stock option agreement or stock redemption agreement between him and DDM. Mr. Robson argues that, because DDM violated R.C. 1701.37(A) by failing to maintain accurate records, DDM was subject to statutory damages. He argues the trial court abused its discretion when it refused to award him damages under R.C. 1701.94(A).

**{¶55}** As previously noted, R.C. 1701.37(A) requires corporations to "keep correct and complete books and records of account, together with minutes of the proceedings of its incorporators, shareholders, directors, and committees of the directors, and records of its shareholders * * *." R.C. 1701.37(A). If a corporation fails to comply with those recordkeeping duties, it shall be subject to "a forfeiture of one hundred dollars" plus "ten dollars for every day

that such failure continues, beginning * * * with the fifth day after written request by a shareholder that the corporation comply with [R.C. 1701.37]." R.C. 1701.94(A)(6). However, a trial court "may reduce, remit, or suspend such forfeiture on such terms as it deems reasonable when it appears that the failure was excusable or that the imposition of the full forfeiture would be unreasonable or unjust." R.C. 1701.94(C).

{¶56} Upon review, we cannot properly address the merits of Mr. Robson's argument. Mr. Robson objected to the magistrate's decision not to award him statutory damages under R.C. 1701.94. DDM responded in opposition to his objection and tendered several arguments in support of its position. DDM argued: (1) Mr. Robson failed to allege in his complaint that DDM violated R.C. 1701.37(A) by failing to keep the books of account, minutes of proceedings, or records of its shareholders; (2) Mr. Robson failed to produce any evidence at trial that DDM violated R.C. 1701.37(A); (3) Mr. Robson never sent a written request to DDM, demanding it comply with R.C. 1701.37(A); (4) R.C. 1701.94 does not authorize statutory damages for a violation of R.C. 1701.37(C); and (5) the trial court should exercise its discretion under R.C. 1701.94(C) to reduce, remit, or suspend any statutory damages that might apply to DDM based on DDM's reasonable belief that Mr. Robson was not a shareholder. In ruling on Mr. Robson's objections, the trial court did not specifically address his objection as to statutory damages. Instead, the trial court wrote:

> [Mr.] Robson has objected to almost every factual determination and conclusion made by the Magistrate. The [c]ourt has carefully reviewed each objection and hereby overrules each objection. The [c]ourt finds that DDM's opposition brief * * * accurately sets forth the rationale behind the [c]ourt overruling the objections, and that rationale from the reply brief is hereby incorporated herein as the rationale for the [c]ourt overruling [Mr.] Robson's objections. To the extent the reply brief did not deal with any objection or specific portion of an objection, that objection is hereby overruled as having no merit.

Thus, the trial court did not indicate which of DDM's many arguments it relied upon in rejecting Mr. Robson's request for statutory damages.

**{¶57}** "This Court has recognized that, '[if] a trial court's judgment is not sufficiently detailed, a reviewing court may be left in the unfortunate position of being unable to provide meaningful review.'" *Kokoski v. Kokoski*, 9th Dist. Lorain No. 12CA010202, 2013-Ohio-3567, ¶ 11, quoting *Zemla v. Zemla*, 9th Dist. Wayne No. 11CA0010, 2012-Ohio-2829, ¶ 19. This Court is unable to determine whether the trial court refused to award Mr. Robson damages because he was not entitled to them as a matter of law, he failed to set forth sufficient evidence to justify a statutory damage award, or it would be unreasonable or unjust to impose statutory damages upon DDM under the circumstances. Without knowing the basis for the trial court's decision, this Court cannot apply the appropriate standard of review and analyze its decision on the merits. Accordingly, this matter must be remanded to the trial court for further explanation regarding its decision not to award Mr. Robson statutory damages based on DDM's alleged violation of R.C. 1701.37(A). *See Kokoski* at ¶ 11. *Accord Pitts v. Sibert*, 9th Dist. Summit No. 27345, 2015-Ohio-3020, ¶ 21. Mr. Robson's second assignment of error is sustained, in part, on that basis.

<u>Duty to Provide Mr. Robson with Certain Agreements</u>

**{¶58}** Mr. Robson argues DDM breached its contract with him by treating him differently than other similarly situated shareholders. The lower court found Mr. Robson's shares were not subject to any restrictions because they predated restrictions associated with a stock ownership plan DDM instituted in 2017 and Mr. Robson never executed a stock redemption agreement. That finding led the lower court to conclude that Mr. Robson's shares constituted a separate and distinct class of stock that DDM had no obligation to redeem. According to Mr. Robson, his shares were not unique because he was similarly situated to other shareholders who received their shares before 2017, including Mr. McConnell and certain members of the founder's family. He notes that DDM offered Mr. McConnell and members of the founder's family a stock transfer agreement or buy/sell

agreement so they could sell their shares back to the company at a set price under certain terms. According to Mr. Robson, DDM had some type of redemption agreement with every one of its shareholders apart from him. He argues the company breached its contractual duty to him as a shareholder by not offering him an agreement to repurchase his shares. Mr. Robson asks this Court to overturn the lower court's judgment and find DDM breached its contractual duties to him.

{¶59} "A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 41. Mr. Robson's share certificates created a contractual relationship between him and DDM. *See Geiger v. American Seeding Mach. Co.*, 124 Ohio St. 222 (1931), syllabus ("A stock certificate issued by a corporation is a contract between the corporation and the holders of certificates of all classes of stock."). Yet, Mr. Robson has not explained why, under his contract with DDM, the company was required to offer him either a stock transfer agreement or a buy/sell agreement. He has failed to identify any specific contractual term that DDM allegedly breached. *See State ex rel. Maher v. Akron*, 9th Dist. Summit No. 28761, 2018-Ohio-4310, ¶ 25. Absent proof of a duty to perform on the part of DDM, Mr. Robson cannot establish a claim for breach of contract. *See Lucarell* at ¶ 41. Thus, the lower court did not err by refusing to find DDM in breach of contract for failing to offer Mr. Robson a stock transfer agreement or other buy/sell agreement.

Duty to Issue Mr. Robson Proper Stock Certificates

{¶60} Mr. Robson argues DDM breached its contract with him by failing to issue him new stock certificates following stock splits that occurred in 1984, 1989, and 1999. According to Mr. Robson, DDM should have cancelled his old stock certificate(s) and issued him new ones

whenever a stock split occurred. Because he never received updated certificates, he argues the lower court erred by not ruling in his favor on this aspect of his breach of contract claim.

{¶61} It is undisputed that Mr. Robson received two stock certificates from DDM: a certificate for 25 shares in 1980, and a certificate for 225 shares in 1984 following a 10-to1 stock split. Upon review, Mr. Robson has not pointed to (1) any law that would have specifically required DDM to cancel his old certificates and issue him new ones, or (2) any specific contractual term that would require that action. *See* App.R. 16(A)(7). Moreover, Mr. Robson has not explained how DDM's failure to issue him additional certificates prejudiced him. *See Princess Kim, L.L.C.*, 2015-Ohio-4472, at ¶ 18. The lower court found Mr. Robson was entitled to additional shares based on each of the stock splits that occurred in 1984, 1989, and 1999. DDM's failure to issue him additional certificates did not prevent the lower court from awarding him additional shares. Accordingly, even if DDM somehow violated a contractual duty to Mr. Robson by not issuing him new certificates, Mr. Robson has not demonstrated resulting prejudice. *See id.*

Number of Shares

{¶62} In ruling on Mr. Robson's claim for breach of contract, the lower court found that he owned 3,000 shares of DDM stock. The lower court determined that DDM experienced the following stock splits: (1) a 10-to-1 split in 1984; (2) a 3-to-1 split in 1989; and (3) a 4-to-1 split in 1999. The lower court multiplied Mr. Robson's original 25 shares by each of those splits to arrive at 3,000 shares (i.e., 25 x 10 = 250; 250 x 3 = 750; and 750 x 4 = 3,000). Mr. Robson argues the lower court erred in its calculations because he was entitled to 5,700 shares. Given that he possessed two separate stock certificates, Mr. Robson argues, the lower court should have applied DDM's stock splits to each of his certificates. Doing so would result in Mr. Robson owning 3,000

shares on his 1980 certificate for 25 shares and an additional 2,700 shares on his 1984 certificate for 225 shares (i.e., 225 x 3 = 675; and 675 x 4 = 2,700) for a combined total of 5,700 shares.

**{¶63}** Upon review, we cannot conclude the lower court erred when it found Mr. Robson owned 3,000 shares of DDM stock. It is undisputed that DDM experienced stock splits in 1984, 1989, and 1999. Mr. Robson acknowledged that, when he received his 225 shares in 1984, his new stock certificate came with a letter from DDM's founder. The letter explained Mr. Robson was receiving 225 shares as a direct result of a 10-to-1 stock split such that, following the split, he had a total of 250 shares. Mr. McConnell testified that DDM routinely handled its stock splits in that manner on the advice of counsel. After a stock split, DDM would calculate the number of shares each shareholder would receive as part of a split and only issue certificates for a shareholder's new shares. That way, DDM avoided having to cancel and collect all the older certificates before issuing new ones. Mr. McConnell confirmed that his own shares had been split in the same manner as Mr. Robson's.

**{¶64}** Mr. McConnell testified that Mr. Robson had a total of 250 shares in 1984. His shares were simply split across two certificates. Mr. Robson did not present any evidence to the contrary. Nor has he set forth any authority tending to establish that all shares owned by a single shareholder must be contained in a single certificate. *See* App.R. 16(A)(7). Mr. Robson essentially asked the lower court to double-count his shares, which would have resulted in a windfall. Because he has not shown he was entitled to more than 3,000 shares of DDM stock, we reject his argument to the contrary.

Share Valuation

**{¶65}** Mr. Robson argues the lower court erred when it failed to value his stock at $76 per share. Evidence produced at trial showed DDM relied on a valuation analysis performed by Stout

to value (1) shares owned by employees through the employee stock ownership plan DDM instituted in 2017; (2) shares Mr. McConnell obtained before 2017; and (3) certain shares redeemed by DDM in 2019 through a buy/sell agreement. Mr. McConnell agreed the Stout value of his stock in 2021 was around $76 per share. Yet, the lower court refused to apply that Stout value to Mr. Robson's shares. The lower court found his unrestricted shares constituted a separate and distinct class of stock. Because Mr. Robson did not present expert testimony to establish the value of his unique shares, the lower court declined to assign them any value.

**{¶66}** "The valuation of any stock interests * * * is a factual matter subject to a court's discretion." *Wohleber v. Wohleber*, 9th Dist. Lorain No. 08CA009402, 08CA009403, 2009-Ohio-995, ¶ 27. *See also Tabatabai*, 2009-Ohio-3139, at ¶ 18 (actions on magistrate's decision reviewed with reference to nature of the underlying matter). Accordingly, a trial court's valuation decision will stand so long as, in reaching that decision, the court did not act in an unreasonable, arbitrary, or unconscionable manner. *See Blakemore*, 5 Ohio St.3d at 219. Given that the lower court found Mr. Robson's unrestricted stock was distinct from any restricted stock DDM had valued, we cannot conclude it abused its discretion when it refused to value Mr. Robson's shares without any expert testimony about their specific value. Mr. McConnell repeatedly denied that DDM simply applied Stout value to every category of its stock. Rather, he described how DDM's Board of Directors would decide whether to apply Stout value to its stock each year. He further explained that Stout value was used to value his own shares and certain shares redeemed by DDM in 2019 because the terms of his redemption agreement and the buy/sell agreement applicable to those other shares specifically provided Stout value could be used to value those shares. Because Mr. Robson never executed a redemption agreement, the parties never agreed to use Stout value to value his shares.

**{¶67}** It was Mr. Robson's burden to establish his damages on his breach of contract claim. *See Lucarell*, 152 Ohio St.3d 453, 2018-Ohio-15, at ¶ 41. He maintained throughout the litigation that he was not subject to a stock redemption agreement, so he had no duty to surrender his shares when he resigned. His argument led the lower court to the logical conclusion that his unrestricted shares were different than other, restricted shares. Given that conclusion, we cannot say the trial court acted unreasonably, arbitrarily, or unconscionably when it found Mr. Robson could not simply rely on values attributed to restricted shares to prove the value of his unrestricted shares. Because Mr. Robson has not shown the lower court abused its discretion in refusing to value his shares, this Court rejects his argument to the contrary.

Calculation of Dividends

**{¶68}** Finally, Mr. Robson argues the lower court erred when it found he was only entitled to declared dividends in the amount of $1,857.50. He argues the lower court improperly calculated that damage award based on the evidence presented at trial. According to Mr. Robson, he was entitled to $14,140 in unpaid dividends.

**{¶69}** Mr. McConnell testified that DDM paid dividends to its shareholders on an annual basis. DDM produced the minutes from a special meeting of its Board of Directors in 1981, showing a dividend value of 15 cents per share for that year. DDM also produced the minutes from a regular meeting of its Board of Directors in 1984, showing a dividend value of 5 cents per share for that year. Mr. McConnell did not know whether Mr. Robson had received his dividend for the 1984 year. Finally, DDM introduced a dividend calculation that Mr. McConnell prepared for trial. Mr. McConnell testified that he used DDM's records (i.e., minutes from meetings of its Board of Directors) to ascertain the dividend value of its shares from 1985 through 2020. He then applied those values to Mr. Robson's shares, taking care to account for any additional shares Mr.

Robson received due to DDM's stock splits. By Mr. McConnell's calculations, Mr. Robson ought to have received $1,935 in dividends from 1985 to 2020. He confirmed that, apart from one year when DDM approved a dividend of 15 cents per share, the company had never declared a dividend of more than 5 cents per share.

{¶70} Because DDM only introduced minutes from two of its Board of Directors meetings to establish dividend value, Mr. Robson argued those two dividend years should be averaged to calculate his dividend value. As noted, minutes from a 1980 meeting established a dividend value of 15 cents, and minutes from a 1984 meeting established a dividend value of 5 cents. Averaging those two values, Mr. Robson argued he was entitled to 10 cents per share for each of his shares from 1985 to 2020 for a total award of $14,140 in unpaid dividends.

{¶71} The lower court relied on Mr. McConnell's dividend calculation to determine the dividend value of Mr. Robson's shares from 1985 to 2020. It determined that DDM selected the following dividend values: (1) 5 cents per share in 1984; (2) 3 cents per share in 1985; (3) 5 cents per share in 1986; (4) 2 cents per share from 1987-1998; (5) 2 cents per share in 1989; (6) 2 cents per share from 1990-1999; (7) 2 cents per share from 2000-2004; (8) 3 cents per share from 2005-2017; and (9) 2 cents per share from 2018-2020. Multiplying those dividend values by the shares Mr. Robson owned during each of those years, the lower court found Mr. Robson was entitled to $1,857.50 in unpaid dividends.[2]

{¶72} Mr. Robson argues the lower court erred when it refused to use a 10-cent-per-year average to calculate his damage award for unpaid dividends. He maintains that DDM only

---

[2] Notably, the lower court arrived at a lower figure than Mr. McConnell due to a difference in calculating the years 2005-2017. Mr. McConnell mistakenly described that passage of time as 14 years rather than 13 years, so his calculation included an additional year of credit. The lower court corrected that error by treating that span of time as 13 years, which resulted in a lower total calculation.

produced records for two dividend years: 1980 and 1984. Because DDM did not produce additional records to evidence its dividends in other years, Mr. Robson insists it was proper to average the two years of record to arrive at a value of 10 cents per share.

**{¶73}** Upon review, we cannot conclude the lower court erred in its dividend calculations. Mr. McConnell testified as DDM's former senior vice president of finance and chief financial officer. He confirmed that, apart from the 1980 year, DDM had never declared a dividend value in excess of 5 cents per share. He also created a dividend calculation based on his personal review of DDM's records for the years 1985 through 2020. Mr. Robson has not explained why the lower court could not rely on Mr. McConnell's testimony and his dividend calculation. This Court will not construct an argument on his behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at \*8. Because Mr. Robson has not shown the lower court erred in its dividend calculation, this Court rejects his argument.

**{¶74}** In sum, Mr. Robson's second assignment of error is sustained to the extent we must remand this matter to the trial court for further explanation regarding its decision not to award him statutory damages based on DDM's alleged violation of R.C. 1701.37(A). The remainder of Mr. Robson's second assignment of error is overruled.

## MR. ROBSON'S ASSIGNMENT OF ERROR III

**THE TRIAL COURT ERRED WHEN IT AFFIRMED THE MAGISTRATE'S DECISION ON [MR.] ROBSON'S CLAIM FOR CONVERSION.**

**{¶75}** In his third assignment of error, Mr. Robson argues the lower court erred when it ruled in favor of DDM on his claim for conversion. We do not agree.

**{¶76}** "[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with

his rights." *Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 96 (1990). "To prevail on a claim of conversion, a plaintiff must prove (1) that it owned or had the right to control the property at the time of the conversion, (2) the defendant's wrongful act or disposition of the plaintiff's property rights, and (3) damages." *Pelmar USA, L.L.C. v. Mach. Exchange Corp.*, 9th Dist. Summit No. 25947, 2012-Ohio-3787, ¶ 12. "A demand and refusal in a conversion action are usually required to prove the conversion of property otherwise lawfully held." *Ferreri v. Goodyear Local No. 2 United Rubber, Cork, Linoleum & Plastic Workers of America Home Assn.*, 9th Dist. Summit No. 16311, 1994 WL 45740, *2 (1994), quoting *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 24 Ohio App.3d 91, 94 (10th Dist.1985).

**{¶77}** The lower court found Mr. Robson failed to prove a claim of conversion because his shares were not subject to a stock redemption agreement. Mr. Robson essentially took the position that DDM had gifted him stock, so his shares were unrestricted. As previously noted, his argument led the lower court to the logical conclusion that Mr. Robson's unrestricted shares were unique and distinct from any restricted shares of DDM stock. The lower court found DDM had no obligation to purchase Mr. Robson's shares, and, in any event, Mr. Robson failed to set forth any evidence as to the value of his unrestricted shares. Based on those findings, the lower court concluded that DDM "[had] converted nothing."

**{¶78}** Mr. Robson argues he was entitled to damages on his claim for conversion because he asserted his rights as a shareholder, the lower court found he was a shareholder, but DDM continued to deny him information, refused to provide him with a stock transfer agreement or updated share certificates, and denied him the value of his stock and his dividends. According to Mr. Robson, he was entitled to damages based on the current market value of his stock. He argues the lower court erred by entering judgment in favor of DDM on his conversion claim.

**{¶79}** Mr. Robson has not identified the exact point in time he believes his claim for conversion accrued. Nor has he directly addressed the lower court's rationale regarding the impact of his failure to execute a stock redemption agreement and DDM's concomitant lack of an obligation to redeem his stock. Mr. Robson simply argues he is entitled to damages for DDM's ongoing conversion of his shares in the amount of the current value of DDM's stock.

**{¶80}** Assuming without deciding that Mr. Robson set forth a proper claim for conversion, we cannot conclude the lower court erred when it rejected his claim based on his failure to establish his damages. As previously noted, Mr. Robson did not present any expert testimony to establish the value of his unique, unrestricted shares. *See* Discussion of Assignment of Error Two, *supra*. We have already upheld the lower court's decision not to value his shares in the same manner as DDM's restricted stock. *See id.* Damages must be established before a claimant can prevail on a claim for conversion. *See Pelmar USA, L.L.C.*, 2012-Ohio-3787, at ¶ 12. Because Mr. Robson did not establish the value of his unrestricted shares, and hence, his damages, the lower court did not err by rejecting his claim for conversion. *See Mercer v. Halmbacher*, 9th Dist. Summit No. 27799, 2015-Ohio-4167, ¶ 15-17; *Trikilis v. M.J.L. Truck Sales, Inc.*, 9th Dist. Medina No. 1807, 1990 WL 27169, *2 (Mar. 7, 1990). Mr. Robson's third assignment of error is overruled.

### MR. ROBSON'S ASSIGNMENT OF ERROR IV

**THE TRIAL COURT ERRED WHEN IT AFFIRMED THE MAGISTRATE'S DECISION ON [MR.] ROBSON'S CLAIM FOR FRAUD.**

**{¶81}** In his fourth assignment of error, Mr. Robson argues the lower court erred when it ruled in favor of DDM on his claim for fraud. We do not agree.

**{¶82}** The crux of Mr. Robson's argument is that the lower court erred by ruling in DDM's favor because the weight of the evidence supported his claim for fraud. This Court reviews challenges to the weight of the evidence under the standard set forth in *Eastley v. Volkman, supra*.

*See Norton v. Dominion Energy Services, Inc.*, 9th Dist. Summit No. 29543, 2021-Ohio-1278, ¶ 34. *See also Tabatabai*, 2009-Ohio-3139, at ¶ 18 (actions on magistrate's decision reviewed with reference to nature of the underlying matter). Consequently, we must determine whether the trial court "clearly lost its way and created such a manifest miscarriage of justice that [its judgment] must be reversed and a new trial ordered." (Internal quotations and citations omitted.) *Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20.

{¶83} The elements of a fraud claim consist of:

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."

*Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 47, quoting *Gaines v. Preterm-Cleveland Inc.*, 33 Ohio St.3d 54, 55 (1987). "An action in fraud will only be found if all of the elements are present and 'the absence of one element is fatal to recovery.'" *Goodman Beverage Co., Inc. v. Kerr Beverage Co.*, 9th Dist. Lorain No. 02CA008142, 2003-Ohio-2845, ¶ 21, quoting *Westfield Ins. Co. v. HULS Am., Inc.*, 128 Ohio App.3d 270, 296 (10th Dist.1998).

{¶84} Mr. Robson argues DDM engaged in fraud when it repeatedly advised him that he was not a shareholder. He notes that DDM continued to deny his shareholder status even after he produced copies of his stock certificates and prevailed on his claim for declaratory judgment. Further, he argues DDM engaged in fraud through Mr. McConnell when he completed two affidavits in 1998 and averred that Mr. Robson's shares had been redeemed for value. Because DDM intended for him to rely on its fraudulent records and false statements, Mr. Robson argues, he was entitled to damages on his fraud claim.

**{¶85}** The lower court rejected Mr. Robson's fraud claim because it found no evidence that DDM made any of its representations falsely, with knowledge of their falsity, or with utter disregard and recklessness as to whether they were true or false. The lower court found Mr. McConnell's affidavits and DDM's position were based on the best information available to them at the time. While the lower court ultimately excluded documents upon which DDM relied to support its position, the court refused to find DDM liable for fraud given that it had simply relied on its own records in opposing Mr. Robson's demands.

**{¶86}** Having reviewed the record, we cannot conclude the lower court clearly lost its way and created a manifest miscarriage of justice when it ruled in DDM's favor on Mr. Robson's claim for fraud. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. Mr. Robson essentially argued that DDM engaged in fraud by taking a position contrary to his own in anticipation of litigation and during the litigation. Even assuming those facts could support a fraud claim, Mr. Robson failed to show DDM made representations it knew to be false or acted with utter disregard and recklessness as to the truth or falsity of its statements. As the lower court noted, DDM had limited records tending to show Mr. Robson's stock certificates were void and/or cancelled and his shares had been redeemed. Thirty years had passed by the time Mr. Robson inquired about his shareholder status, so the passage of time complicated DDM's ability to secure any additional information. To the extent Mr. McConnell completed affidavits in 1998 indicating DDM had redeemed Mr. Robson's shares for value, the evidence showed he did so in connection with an internal file review the company conducted. Mr. McConnell did not create those affidavits to share them with Mr. Robson. Accordingly, it is unclear how the affidavits could have been created for the purpose of misleading Mr. Robson or triggering his justifiable reliance on them. *See Groob*, 108 Ohio St.3d 348, 2006-Ohio-1189, at ¶ 47, quoting *Gaines*, 33 Ohio St.3d at 55. Mr. Robson

has not shown the lower court's ruling on his fraud claim is against the manifest weight of the evidence. Thus, Mr. Robson's fourth assignment of error is overruled.

## MR. ROBSON'S ASSIGNMENT OF ERROR V

**THE TRIAL COURT ERRED WHEN IT AFFIRMED THE MAGISTRATE'S DECISION ON [MR.] ROBSON'S CLAIM FOR ATTORNEY'S FEES.**

**{¶87}** In his fifth assignment of error, Mr. Robson argues the lower court erred when it denied his request for attorney fees. He argues he was entitled to his attorney fees because he prevailed on his claim for declaratory judgment and DDM engaged in bad faith by repeatedly denying him his shareholder status and associated rights. Upon review, we reject his argument.

**{¶88}** "Under Ohio law, an award of attorney fees ordinarily requires either explicit statutory authorization or a finding of bad faith on the part of the party who did not prevail." *No-Burn, Inc.*, 2011-Ohio-5635, at ¶ 30. Former R.C. 2721.09 permitted trial courts to award attorney fees to a prevailing party in a declaratory judgment action "[w]henever necessary or proper * * *." *Motorists Mut. Inc. Co. v. Brandenburg*, 72 Ohio St.3d 157, 159 (1995), quoting former R.C. 2721.09. The General Assembly later amended that statute, however, making a trial court's discretion thereunder "[s]ubject to section 2721.16 of the Revised Code * * *." R.C. 2721.09. "R.C. 2721.16 * * * prohibits an award of attorney fees on a claim for declaratory judgment unless the Revised Code explicitly authorizes such an award." *Harkai v. Scherba Industries, Inc.*, 9th Dist. Medina No. 02CA0007-M, 2003-Ohio-366, ¶ 15. If no statutory authorization exists, it is the prevailing party's burden to "demonstrate[] bad faith on the part of the unsuccessful litigant * * *." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, ¶ 7.

**{¶89}** "This Court reviews a trial court's determination on a request for attorney fees for an abuse of discretion." *No-Burn, Inc.* at ¶ 31. *See also Tabatabai*, 2009-Ohio-3139, at ¶ 18

(actions on magistrate's decision reviewed with reference to nature of the underlying matter). An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons*, 66 Ohio St.3d at 621.

{¶90} Mr. Robson argues the lower court abused its discretion by failing to award him attorney fees under R.C. 2721.09. He argues that statute allows a trial court to award attorney fees to a prevailing party in declaratory judgment proceedings. As noted, however, R.C. 2721.09 is subject to the restriction set forth in R.C. 2721.16. Trial courts may only award attorney fees under R.C. 2721.09 if "the Revised Code explicitly authorizes such an award." *Harkai*, 2003-Ohio-366, at ¶ 15. Apart from a general citation to R.C. 2721.09, Mr. Robson has not set forth any explicit statutory authorization for an award of attorney fees. This Court will not construct an argument on his behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8. We, therefore, reject Mr. Robson's argument that the lower court abused its discretion by not awarding him attorney fees under R.C. 2721.09.

{¶91} This Court also cannot conclude the lower court abused its discretion when it refused to award Mr. Robson attorney fees due to any alleged bad faith on the part of DDM. Mr. Robson claims DDM acted in bad faith by consistently denying him his shareholder status and associated rights even after the lower court entered declaratory judgment in his favor. As previously noted, however, DDM had limited records tending to show Mr. Robson's stock certificates were void and/or cancelled and his shares had been redeemed. Thirty years passed between the time Mr. Robson left DDM and the time he contacted DDM to ask about his shareholder status. Mr. Robson's shareholder status was debatable, and DDM opposed his demands in anticipation of litigation and while actively litigating this case. While the trial court

found Mr. Robson was a shareholder at the conclusion of the first trial, its order was not final and appealable at that time. Until this matter concluded, DDM was never subject to a final judgment regarding Mr. Robson's shareholder status. Under the foregoing circumstances, we cannot conclude the trial court abused its discretion by refusing to award Mr. Robson attorney fees. As such, Mr. Robson's fifth assignment of error is overruled.

## III.

**{¶92}** Mr. Robson's second assignment of error is sustained to the extent this matter must be remanded to the trial court for further explanation regarding its decision not to award him statutory damages. The remainder of his second assignment of error and his first, third, fourth, and fifth assignments of error are overruled. DDM's assignments of error are also overruled. The judgment of the Medina County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to

mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
BETTY SUTTON
FOR THE COURT

STEVENSON, J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

THEODORE J. LESIAK, Attorney at Law, for Appellant/Cross-Appellee.

TIMOTHY D. JOHNSON and ROBERT A. WEST, JR., Attorneys at Law, for Appellee/Cross-Appellant.